608 F.2d 64
 Fed. Sec. L. Rep. P 97,143
 Charles G. RODMAN, Trustee of the Estate of W. T. Grant
Company, Bankrupt, Plaintiff-Appellant,
v.
The GRANT FOUNDATION, the Connecticut Bank and Trust
Company, Individually and as Trustee of Trusts established
in December 1942 and May 1956 for the benefit of Helen Grant
Biddle Allchin, Edward Staley, Richard W. Mayer, John G.
Byler, Raymond H. Fogler, John C. Curtin, Harry E. Pierson,
A. Richard Butler, John J. LaPlante, Joseph A. Livolsi,
Louis C. Lustenberger, James G. Kendrick, Joseph W. Chinn,
Jr., John D. Gray, Joseph Hinsey, DeWitt Peterkin, Jr.,
Charles F. Phillips, and Asa T. Spaulding, Defendants-Appellees.
 
 No. 744, Docket 78-7619.
 United States Court of Appeals,
Second Circuit.
 Argued May 9, 1979.
Decided Oct. 12, 1979.
 Dennis J. Block, New York City (Weil, Gotshal & Manges, New York City, Harvey R. Miller, Mel P. Barkan, Irwin H. Warren, New York City, of counsel), for plaintiff-appellant.
 James W. Lamberton, New York City (Cleary, Gottlieb, Stein & Hamilton, New York City, Victor I. Lewkow, Thomas J. Moloney, Jane Winer, New York City, of counsel), for defendants-appellees Staley, Mayer, Byler, Fogler, Curtin, Pierson, Butler, Lustenberger, Kendrick, Chinn, Gray, Hinsey, Peterkin, Phillips and Spaulding.
 Thomas C. Morrison, New York City (Patterson, Belknap, Webb & Tyler, New York City, Thomas Thacher and Thomas C. Morrison, New York City, of counsel), for defendant-appellee The Grant Foundation.
 Lord, Day & Lord, New York City (John W. Castles 3d, Henry deForest Baldwin, Genevieve L. Fraiman, James M. Morrissey, New York City, of counsel), for defendant-appellee The Connecticut Bank and Trust Co.
 Before SMITH, OAKES and VAN GRAAFEILAND, Circuit Judges.
 VAN GRAAFEILAND, Circuit Judge:
 
 
 1
 This lawsuit represents an attempt by the Trustee in Bankruptcy of W. T. Grant Company to undo certain purchases by the Company of its own stock made between 1969 and 1972. The Company was adjudicated a bankrupt in 1976, and its stock is now worthless. The complaint, alleging federal securities law violations, demands rescission of the transactions or, in the alternative, damages representing the full purchase price.[1] The district court, in an opinion reported at 460 F.Supp. 1028 (S.D.N.Y.) granted summary judgment in favor of all defendants and plaintiff has appealed.
 
 
 2
 Appellant's discovery, which resulted in over 9500 pages of sworn testimony and the production of more than 100,000 pages of documents, created a detailed factual setting for defendants' summary judgment motion. For our purposes, however, a review of the salient facts will suffice.
 
 
 3
 The Company began as a single retail store in 1906. It grew steadily, and by 1968 the Company had over 1,000 stores and $1 billion in sales. It also had a net worth of over $283 million and net earnings for 1968 of over $37 million. At that time, it had 13,854,220 shares of common stock issued and outstanding.
 
 
 4
 As the company grew, its founder, William T. Grant, became a wealthy man, and he decided at an early date to use his wealth for charitable purposes. In 1936 he organized the Grant Foundation, which funds programs relating to the psychological and behavioral problems of young people. During the years that followed, Mr. Grant also created numerous trusts for the benefit of relatives, friends and employees, with designated charities as remaindermen. In the majority of trusts, the ultimate charitable recipient was the Foundation. Because the Foundation and the trusts were funded with Grant stock, by 1968 the Fund owned 1,294,324 shares of Grant common stock and had remainder interests in some 3,400,000 additional shares.
 
 
 5
 When Mr. Grant began the above-described program, the Company was still relatively small. It had total assets of approximately $38 million, and there were approximately 1,200,000 shares of common stock outstanding. Because Mr. Grant felt that it would "not take a relatively large investment to gain control of an enterprise of this size", he expressed the hope that the Foundation and the trusts would retain their Grant holdings. With the growth of the Company, Mr. Grant's apprehensions disappeared. In a 1968 letter sent to a trustee, with a copy to the Foundation, Mr. Grant wrote:
 
 
 6
 Today, the Grant Company has total assets in excess of $400 million. It has annual sales of almost $1 billion, it has over 1,000 stores, it has outstanding almost 13,000,000 shares of common stock with a total market value of over $450 million and it has over 17,500 stockholders. To acquire control of an enterprise of this size would require an investment so large it seems reasonable to believe that, while it is possible, it is unlikely anyone would undertake it.
 
 
 7
 Thus, under present conditions I believe there no longer is reason for me to fear that, when I am no longer here, outside unknown interests might get control of the Company, and, motivated by selfish considerations, might destroy the organization which during my lifetime I built up, and hurt many people close to me who have come to be dependent upon the continued success of the Company.
 
 
 8
 Mr. Grant's change of heart coincided with what the Foundation's Board of Trustees felt was prudent investment policy, and in June 1968 the trustees adopted a policy of portfolio diversification. The Foundation sold some of its stock on the open market and some to the Company. This litigation involves the latter sales and several sales to the Company from trustees or remaindermen.
 
 
 9
 The stock in question was purchased by the Company primarily for use in its Employees Stock Purchase Plan. The Company had had such a plan since 1950, and, by 1968, 4,600 of its employees had purchased or contracted to purchase over 2,000,000 shares. The shares received by these employees were all authorized but previously unissued, and their issuance resulted in an annual dilution of per share earnings of between one percent and one and one-half percent. In November 1968, the Company decided to use treasury rather than unissued shares, and appellee Edward Staley, Chairman of the Company Board of Directors, informed the Foundation that the Company was interested in buying some Foundation-held stock for this purpose. Negotiations that followed led to an agreement dated February 25, 1969, which provided that the Company would buy 250,000 shares on May 1, 1969, and would have the option to buy up to 950,000 additional shares in annual installments of between 200,000 and 300,000 shares. The purchase price was to be the average of the stock's daily closing price on the New York Stock Exchange during the month preceding each purchase, less 3 percent. The agreement was approved by the Foundation's Board of Trustees on February 18, 1969, and by the Company's Board of Directors on February 25, 1969.
 
 
 10
 Under New York law, the directors could authorize the purchase of Company stock out of surplus without any special authorization from the shareholders.[2] Laue v. Bethlehem Steel Corp., 243 App.Div. 57, 59, 276 N.Y.S. 173 (1934). However the agreement with the Foundation provided that the Company would not be obligated to make any purchases thereunder unless the agreement was approved by the shareholders, excluding the Foundation, at the Company's 1969 annual meeting. Accordingly, the Company's proxy statement for its annual meeting described the agreement and solicited shareholder approval, which was given. During the next four years, the Company bought 800,000 shares pursuant to the contract at a total price of $34,800,000. The Company exercised its option to terminate the contract on February 15, 1973, at which time Grant's stock was selling at 371/8.
 
 
 11
 On October 28, 1969, the Company entered into an agreement with appellees Connecticut Bank and Trust Company and Richard W. Mayer as trustees under one of the Grant trusts to purchase 246,664 shares of Company stock at a price 3 percent less than the average closing prices on the New York Exchange during November 1969. This agreement also provided for shareholder approval and a special meeting, preceded by a second proxy statement, was held. Following shareholder approval, the transaction was consummated.
 
 
 12
 Between 1969 and 1972, the Grant Board authorized or ratified three other purchases of Company stock without seeking shareholder approval. On June 2, 1969, the Company purchased 20,000 shares of common stock from Connecticut Bank and Trust Company as trustee under a Grant trust at a price 3 percent less than the average New York Stock Exchange price on May 29, 1969, and this purchase was ratified by the Board on June 24, 1969. In June 1970 the Company purchased 11,929 shares of its preferred stock from the Foundation at $51.75 per share, the average price that the Company had paid for its preferred shares during 1970. These shares, together with 6,600 preferred shares purchased elsewhere in 1970, were retired by the Board on January 26, 1971. In September 1972 the Company purchased 34,140 shares of common stock at an average price of $39 per share from New York University and Sloan-Kettering Institute for Cancer Research, remaindermen-distributees under several Grant trusts.
 
 
 13
 Appellant has challenged all of the above transactions in actions against the Company's directors, the Foundation, and Connecticut Bank and Trust Company, brought contemporaneously in the New York State Supreme Court and the United States District Court for the Southern District of New York. In the State Court action, which is presently pending, appellant charges defendants with self-dealing, fraud, breach of fiduciary duty, and waste of corporate assets. In his district court complaint, appellant added to these charges alleged violations of sections 12(2) and 17(a) of the Securities Act of 1933 (15 U.S.C. §§ 77L (2) and 77q(a)), sections 14(a) and 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78n(a) and 78j(b)), and Rule 10b-5 (17 C.F.R. § 240.10b-5).
 
 
 14
 Appellant's statutory attack on the February 1969 and October 1969 purchase agreements is based upon several alleged omissions or misstatements in the Company's proxy materials. The district judge held these allegations to be without merit, and our own review of the two proxy statements satisfies us that his determination was not erroneous.
 
 
 15
 The April 1, 1969 proxy statement began by directing the recipients' attention to the Company's annual statement for the year ending January 1, 1969, which had been mailed under separate cover. It then stated that, as of March 1, 1969, the Company had 13,763,384 shares of common stock outstanding and eligible to vote. Of this amount, 1,481,005 shares, or 10.8 percent of the total, were owned of record but not beneficially by Morgan Guaranty Trust Company of New York. The statement listed 20 directors standing for election and their stockholdings, which totaled 920 shares of preferred stock and 261,674 shares of common stock (1.9 percent of the total common stock outstanding). The following additional information concerning appellee-directors Staley, Byler, Fogler, Mayer, and appellee Connecticut Bank and Trust Company was then disclosed:
 
 
 16
 1. Staley and Connecticut Bank and Trust Company were trustees of trusts holding 1,651,940 shares of Grant common stock, representing 11.9 percent of the total voting shares.
 
 
 17
 2. Staley was a trustee of the Foundation, which (a) had a remainder interest in Staley-Connecticut Bank and Trust Company trusts holding 1,164,940 shares, (b) owned 11,929 shares of Grant preferred and 1,294,324 shares of Grant common stock, (c) had a remainder interest in trusts holding 1,058,048 shares, of which Byler, Mayer, and Connecticut Bank and Trust Company were trustees, and (d) had a remainder interest in trusts holding 948,008 shares, of which one Howland Davis and Connecticut Bank and Trust Company were trustees.
 
 
 18
 3. Byler was an officer of the Foundation and a cotrustee with Mayer and Connecticut Bank and Trust Company of trusts holding 1,058,048 shares.
 
 
 19
 4. Fogler was a trustee of the Foundation.
 
 
 20
 5. Mayer was a cotrustee with Byler and Connecticut Bank and Trust Company of trusts holding 1,058,048 shares.
 
 
 21
 Under the headings "Purchase of Outstanding Common Stock" and "Amendment to Employees Stock Purchase Plan", the proxy statement outlined the terms of the agreement with the Foundation, including the number of shares involved and the manner in which the purchase price would be determined. Transactions under the 1960 Employees Stock Purchase Plan were summarized, showing that, out of 210,000 unissued shares reserved for sales under the Plan, 155,895 shares were still available for future offerings. However, because the directors believed it was in the Company's best interest to increase employee participation, the Board had authorized an amendment to the Plan that would permit the Company to offer an additional 100,000 unissued or reacquired shares. It was anticipated that approximately 275,000 shares would be offered to employees during 1969, and, if the contract with the Foundation was approved, the purchased stock would be used for this purpose.
 
 
 22
 Shareholders were informed that the purchase price for stock under the Employees Stock Purchase Plan was the average of the closing prices on the New York Exchange during the month preceding the offering, I. e., the same price-fixing procedure used in the Foundation agreement without the 3 percent discount. Shareholders were then given a summary of prior sales under the 1960 Plan and the one which preceded it, together with the sales prices of shares sold to directors between 1964 and 1969 and the average sales price of shares sold to other employees during the same period, which was $24.69. Shareholders were also reminded that the March 28, 1969 closing price of the Company stock was $45.75.
 
 
 23
 The Company's position concerning the agreement with the Foundation was described as follows:
 
 
 24
 In the judgment of the Board of Directors, the Agreement will provide a desirable means of acquiring shares of Common Stock of the Company to meet the requirements of its Employees Stock Purchase Plan and for other corporate purposes during the period covered by the agreement. In this connection, the Board has by resolution expressed an intention that, to the extent available for such purpose, issued shares of the Company's Common Stock, which have been acquired and are held in the Company's treasury, be used to satisfy the Company's obligations under purchase contracts entered into under such Plan on and after May 1, 1969.[3]
 
 
 25
 The November 7, 1969 proxy statement apprised shareholders that a special meeting would be held to consider the October 28 purchase agreement and a proposed new Employees Stock Purchase Plan. It set forth the number of outstanding shares and the fact that the Company then held 331,500 shares in its treasury. It disclosed that Connecticut Bank and Trust Company and Staley were record owners as trustees of 1,651,940 shares and Connecticut Bank and Trust Company, Mayer, and Byler were record owners as trustees of a total of 2,052,956 shares.
 
 
 26
 The statement then announced the execution of the October 28 agreement providing for the purchase of 246,664 shares from the Grant trust, in which the Foundation had the remainder interest. It described how the purchase price would be computed and stated that it was the Company's intention to use the acquired shares to satisfy its obligations under the existing Employees Stock Purchase Plan and the proposed new Plan. It then reviewed the previously approved agreement with the Foundation and informed shareholders that 250,000 shares had been purchased at a cost of $45.82 per share. It disclosed the relationships of Mayer, Byler, Fogler, and Staley with the Company, the trusts, and the Foundation.
 
 
 27
 The statement then took up the proposed new Employees Stock Purchase Plan, stating that the Board believed such plans to be beneficial because of the "incentive resulting from Common Stock ownership by employees of the Company who are largely responsible for its growth and continued success." The new Plan would permit treasury stock and up to 1,000,000 unissued shares to be sold to employees during the ten-year life of the Plan. The provisions of the proposed Plan were reviewed in detail, and it was announced that approximately 500,000 shares would be offered to employees in the initial offering during April 1970. Sales to employees between 1964 and 1969 under the existing stock purchase plan were then summarized, as in the earlier proxy statement, and the closing price of the Company stock as of November 7, 1969 was stated to be $57.50.[4] Annexed to the statement were the Company's January 31, 1969 financial statement and a statement of operations for the years 1965-69.
 
 
 28
 The above information was set out in a logical and comprehensive manner in both proxy statements and was not "buried" by being dispersed among or immersed in irrelevant data. In determining whether it constituted full and adequate disclosure, the district court properly took into account information already in the public domain and facts known or reasonably available to the shareholders, Seibert v. Sperry Rand Corp., 586 F.2d 949, 952 (2d Cir. 1978), and then measured the Company's additional disclosure by the test of "fair accuracy". Kennecott Copper Corp. v. Curtiss-Wright Corp., 584 F.2d 1195, 1200 (2d Cir. 1978). If, as the district court held, full and fair disclosure was made, appellant could not predicate his federal claim upon an asserted breach of appellees' state-law fiduciary duties. Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 474-80, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); Browning Debenture Holders' Committee v. DASA Corp., 560 F.2d 1078, 1084 (2d Cir. 1977).
 
 
 29
 Appellant asserts numerous inadequacies and improprieties in the proxy statements, all of which the district court rejected. He contends that the proxy materials "falsely represented that the common shares were needed to meet the requirements of (the) Plan and for non-existent 'other corporate purposes' " and that they failed to disclose that some 8,000,000 shares of unissued stock were available for this purpose. This contention misstates the facts. Purchase of Foundation stock was said to be "desirable", not necessary, and there is not the slightest intimation that unissued shares were unavailable for use. Indeed, the Company's 1968 Annual Statement stated plainly that 8,645,780 shares of common stock were authorized but unissued. Shareholders were informed, moreover, that there were no then-existing agreements or plans for company acquisitions, but that "if any such acquisitions should materialize at a future time, it is possible that shares acquired pursuant to the Agreement could be used in connection therewith." As pointed out above, acquired shares were in fact used for both the Employees Stock Purchase Plan and a Company acquisition.
 
 
 30
 Appellant also argues that appellees' "desire to entrench their control was the principal, if not the sole reason for the Grant purchase program" and that this was not disclosed to the shareholders. We find little support for this argument in appellant's references to the record. For example, appellant relies upon a letter dated January 20, 1971 from appellee Staley as a member of the Foundation's Board of Trustees to the Foundation's treasurer, in which he said:
 
 
 31
 I am glad that you told them of the Foundation's policy of gradual divestment of its holdings of W. T. Grant Company common stock to the Grant Company. This will let any "money raiders" know that there is little chance for them to acquire large blocks of Grant stock for their own financial interests at the expense of the Grant Company and its stockholders.
 
 
 32
 At the same time it well establishes the program of The Grant Foundation not having large holdings invested in the Grant Company, nor any other company over a period of time. As I told you, I will lend support, as long as I can, to the policy of the Grant Foundation eventually not having any Grant common stock in its investments.
 
 
 33
 In addition, appellant points to testimony given by Mr. Staley during his deposition, where he testified that he got Mr. Grant to approve the Foundation's liquidation of its Grant holdings "as long as it didn't hurt the Grant people" and that the Foundation intended to dispose of the stock "gradually and in small enough hunks" so that it didn't fall into "unfriendly hands". Mr. Staley also testified:
 
 
 34
 When I started, after I got Mr. Grant's approval, my main objection (sic) was to progressively dispose of it, to make the Company into a public company rather than a company that was closely held by one person or a small group or a couple of groups.
 
 
 35
 Appellant also relies upon handwritten notes of the November 26, 1968 Company Board meeting which, as best we can decipher them, summarize certain comments by appellee Mayer as follows:
 
 
 36
 As Foundation wants to liquidate and Co. wishes to use Treasury stock it may be a good marriage. Buying from Foundation will keep stock in friendly Stock Plan is one of our best benefits.
 
 
 37
 We find little merit in appellant's argument that disclosure of the above-described motivation might have induced shareholders to vote against the purchase of Foundation stock. It would be a strange shareholder indeed who would favor company stock falling into the unfriendly hands of "money raiders" and look with disfavor upon the company being a "public company" rather than one closely held by a small group. In any event, as the district court observed, the effect of the stock purchases on company control was self-evident from the very size of the transaction, involving as it did over ten percent of the outstanding common stock. Whether this stock was retained in the treasury or distributed to employees, it was obviously not going to end up in the hands of "money raiders."
 
 
 38
 The district court also held that corporate control is recognized to be of universal interest to corporate officers and directors and that the failure of proxy materials to disclose this subjective interest is not a violation of the securities laws. There is much support for this position. In Doyle v. Milton, 73 F.Supp. 281, 286 (S.D.N.Y.1947), then Judge Rifkind asked, "Assuming the data are supplied, is the proxy statement nevertheless false if it omits a confession of selfish motive." Pointing out that SEC regulation X-14, now Regulation 14A, 17 C.F.R. § 240.14a-1 Et seq., does not require the inclusion of statements as to motive, he answered the question in the negative. Citing Doyle with approval, we stated in Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787, 803 (2d Cir. 1969), Cert. denied, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970) that "it is sufficient that the relevant facts were fairly stated in the proxy statement." See also Tyco Laboratories, Inc. v. Kimball, 444 F.Supp. 292, 297-98 (E.D.Pa.1977); Jewelcor, Inc. v. Pearlman, 397 F.Supp. 221, 248-49 (S.D.N.Y.1975). Here the proposed actions of the company and their effect on stockholdings were fully disclosed. In the absence of some ulterior wrongful design hinging upon so-called "entrenchment", the directors were not required to put forth in the proxy materials an analysis of their otherwise obvious interest in company control.[5] Stedman v. Storer, 308 F.Supp. 881, 887 (S.D.N.Y.1969); Elgin National Industries, Inc. v. Chemetron Corp., 299 F.Supp. 367, 372-73 (D.Del.1969); See Biesenbach v. Guenther, 588 F.2d 400, 402 (3d Cir. 1978); Golub v. PPD Corp., 576 F.2d 759, 765 (8th Cir. 1978); Altman v. Knight, 431 F.Supp. 309, 313-14 (S.D.N.Y.1977).
 
 
 39
 Appellant also asserts that the proxy materials failed to disclose that the Company "would have to borrow up to an additional $50 million to finance the purchases." However, although appellant has had full access to the Company's financial records, he has failed to establish that such borrowing took place. In support of his contention, he offers only the speculative concern expressed by one director that it might be required. The district court did not err in holding that this asserted lack of disclosure was not a securities law violation. Full factual disclosure need not be embellished with speculative financial predictions. See Seibert v. Sperry Rand Corp., supra, 586 F.2d at 951; Goldberger v. Baker, 442 F.Supp. 659, 665 (S.D.N.Y.1977).
 
 
 40
 The district court properly held, contrary to appellant's contention, that the shareholders were fully informed as to the cost of the purchased stock and the relationship of that cost to both open market value and the past and future sales prices under the Employees Stock Purchase Plan. It did not err in rejecting appellant's contention that the Company deceived its shareholders by not disclosing that the use of purchased Treasury stock was inconsistent with prior Company policy. The fact that prior sales under the Employees Stock Purchase Plan were made from unissued shares was clearly disclosed, and the departure from this policy through the purchase and use of Treasury stock was obvious. Assuming for the argument that it was not, there was nonetheless no actionable deception under the securities laws. Goldberger v. Baker, supra, 442 F.Supp. at 664-65. No other complaints of the appellant directed to the proxy materials are of sufficient substance to warrant discussion.
 
 
 41
 In challenging the acts of the Board of Directors in authorizing or ratifying the three smaller purchases of stock, appellant places much reliance upon this Court's holding in Goldberg v. Meridor, 567 F.2d 209 (2d Cir. 1977), Cert. denied, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978). Prior to Goldberg, the Supreme Court, in Santa Fe Industries, Inc. v. Green, supra, 430 U.S. at 476, 97 S.Ct. at 1302, had specifically rejected the proposition that "a breach of fiduciary duty by majority stockholders, without any deception, misrepresentation, or nondisclosure," violates section 10(b) or Rule 10b-5. The Court expressed its adherence to the proposition that "Congress by § 10b did not seek to regulate transactions which constitute no more than internal corporate mismanagement." Id. at 479, 97 S.Ct. at 1304 (Quoting Superintendent of Insurance v. Bankers Life & Cas. Co., 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971)). In Goldberg,[6] this Court, after directing an amendment of the complaint to permit an allegation concerning the issuance of two deceptive press releases and writing as if the amendment had been allowed, said:
 
 
 42
 We readily agree that if all that was here alleged was that UGO had been injured by 'internal corporate mismanagement', no federal claim would have been stated. But a parent's looting of a subsidiary with securities outstanding in the hands of the public in a securities transaction is a different matter; in such cases disclosure Or at least the absence of misleading disclosure is required. 567 F.2d at 221 (emphasis supplied).
 
 
 43
 If Goldberg may be deemed to have carved out an exception to the Santa Fe doctrine, this case does not fall within that exception.
 
 
 44
 Our concern here, as in most cases under the Securities Acts, is whether there has been full and fair disclosure. See Santa Fe Industries, Inc. v. Green, supra, 430 U.S. at 477-78, 97 S.Ct. 1292; Kennecott Copper Corp. v. Curtiss-Wright Corp., supra, 584 F.2d at 1199. Appellant's charges, while paying lip service to that doctrine, really allege nothing more than corporate mismanagement. Appellant asserts that the purchase of 54,140 shares of common stock (less than four-tenths of one percent of the total outstanding) was a step in a scheme to "entrench" corporate management. However, as already pointed out, every purchase by a corporation of its own stock serves to some extent to consolidate the control of existing management. See Tyco Laboratories, Inc. v. Kimball, supra, 444 F.Supp. at 298. The Securities Acts do not require that a full disclosure of this fact be made to shareholders whenever a corporation purchases any shares of its own stock regardless of the size of the purchase or the use to which the purchased stock is put. There is no contention here that the directors hid from the shareholders the making of the purchases; purchased stock was in fact offered to employees under the Employees Stock Purchase Plan. In the absence of some wrongful purpose associated with such minor entrenchment as may be here involved, the directors' failure to secure prior shareholder approval did not constitute fraud and deception under the federal securities laws.
 
 
 45
 Appellant's contention that some of the directors might not have known of the conflict of interest arising out of the participation by several of its members in the management of the trusts and the Foundation is patently frivolous in the face of the full disclosure made in the Board's own proxy statements. Equally frivolous are appellant's conjectures concerning some unidentified directors' possible lack of knowledge as to the terms and fairness of the purchase agreements that they approved or ratified. One who charges securities fraud must allege with some specificity the acts constituting the fraud. Segal v. Gordon, 467 F.2d 602, 606-10 (2d Cir. 1972).
 
 
 46
 Because we find no securities law violations arising out of the Board's ratification of the two purchases, we need not decide whether the stock purchases involved had been consummated prior to the ratification and whether for that reason the alleged fraud did not arise in connection with the purchase of a security under Rule 10b-5. See Radiation Dynamics, Inc. v. Goldmuntz, 464 F.2d 876, 890-91 (2d Cir. 1972).
 
 
 47
 Appellant's claims against the Foundation and the Connecticut Bank and Trust Company must of necessity fall with those against the company directors. If the directors were guilty of no deception, the Foundation and the bank cannot be held liable as controlling or assisting persons.
 
 
 48
 The district court's grant of summary judgment in favor of all the defendants left appellant free to pursue in the state court a remedy for the wrongs he has alleged. We agree that the state court is the appropriate forum.
 
 
 49
 The judgment appealed from is affirmed.
 
 
 
 [1]
 Appellant summarizes his right of recovery as follows:
 (T)he trustee does not contend that defendants' fraudulent conduct in causing Grant to purchase its stock was the cause of Grant's insolvency; rather it is the Trustee's position that defendants' fraudulent conduct . . . caused Grant to expend some $50 million which it would not otherwise have spent.
 Because we are affirming the district court's finding that appellees were not guilty of securities law violations, we need not decide whether appellant's simplistic approach to recovery is appropriate. We do note, however, that the company received valuable stock in exchange for its expenditure and that much of the stock increased in value following its purchase. For example, the 816,664 shares purchased in 1969 and 1970 at a total cost of $38,946,218 had a market value in 1971 of $57,676,895.
 
 
 [2]
 Grant's January 31, 1969 financial statement showed a surplus of approximately $193 million
 
 
 [3]
 The proxy statement also stated that purchased stock might be used in acquiring other businesses. Company records indicate that 80,000 shares were used in 1969 for a Company acquisition. The same records indicate that, during 1969, 176,000 shares were contracted for under the Employees Stock Purchase Plan at an average price of $46.15 per share, 34 cents per share more than the Company had paid for it. Another 3,900 shares were used in connection with a deferred compensation plan
 
 
 [4]
 The purchase price under the October 28 agreement was $54.13 per share
 
 
 [5]
 SEC v. Parklane Hosiery Co., 558 F.2d 1083 (2d Cir. 1977), relied upon by appellant, is not to the contrary. There, the "overriding purpose" for a going-private scheme was to enable the president and principal shareholder of the company to discharge his personal debts from the company treasury, and there was "not so much as a hint" of these debts in the proxy statement. Id. at 1086
 
 
 [6]
 Goldberg was decided by a divided court with Judge Meskill dissenting on this point