Peter BRAYTON, Richard Aarenau, David Stotland and Adele Stotland, Plaintiffs,

v.

Bertram M. OSTRAU, Stanley S. Spielman, N. Norman Muller, Henry J. Egen, Glen E. Swanson, Russell E. White, Arthur Richenthal, Steven F. Gross, Dorothy Ostrau, Lauren Ostrau, Susan Ostrau, Jonathan Ostrau, Fincon Enterprises, Inc., Stanley Ostrau, Eleanor Ostrau, and Clarostat Mfg. Co., Inc., Defendants.

No. 82 CIV 4137(LBS).

United States District Court, S.D. New York.

March 22, 1983.

Lowey, Dannenberg & Knapp, P.C., New York City, for plaintiffs; Stephen Lowey, New York City, of counsel.

Schwartz, Klink & Schreiber, P.C., New York City, for Ostrau Group defendants; Dale A. Schreiber, Joseph P. Garland, New York City, of counsel.

Skadden, Arps, Slate, Meagher & Flom, New York City, for Management Group defendants; Richard F. Hope, Thomas Schwarz, New York City, of counsel.

Butler, Fitzgerald & Potter, New York City, for Clarostat Mfg. Co., Inc., James M. Davis, New York City, of counsel.

## OPINION

SAND, District Judge.

The plaintiffs in this suit seek to rescind a buy-out agreement between a public corporation and a group of its former stockholders that was entered into after those stockholders waged a closely contested proxy fight for control of the company. The plaintiffs, four current stockholders, bring the action both as representatives of a class of shareholders and derivatively on behalf of Clarostat Manufacturing Company, an electronics concern traded publicly on the American Stock Exchange. They allege violations of Sections 14(a) and 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78j(b), and Rules 14a–9 and 10b–5 promulgated thereunder, 17 C.F.R. §§ 240.14a–9, 240.10b–5. Jurisdiction is based on Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Plaintiffs also bring a number of state law claims under the court's pendent jurisdiction.

The defendants seek to dismiss the action pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b) for failure to state a claim upon which relief can be granted and for failure to plead with particularity. Defendants also move to dismiss plaintiffs' state claims pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction. For the reasons stated below, we find that plaintiffs have failed to allege properly a claim under the federal securities laws and therefore dismiss those claims. We also find that because plaintiffs have failed to state a federal claim, their pendent state claims should be dismissed as well.

### FACTS

The plaintiffs are four shareholders of Clarostat Manufacturing Company ("Clarostat" or "the Company") who seek to challenge an agreement whereby Clarostat agreed to repurchase at a premium its shares held by a dissident shareholder group after an extremely closely contested proxy fight for control of the Company. The

action is brought derivatively on behalf of Clarostat, the nominal defendant, against both the officers and directors of the Company (the "Management Group") and the dissident shareholders who were bought out subsequent to the proxy fight (the "Ostrau Group"). The complaint also alleges a class claim on behalf of certain shareholders against the Management Group.[1]

The second amended complaint alleges the following relevant facts and events, which we must accept as true on this motion to dismiss. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In March of 1982, the Ostrau Group defendants, beneficial owners of approximately 14.1% of the outstanding Clarostat shares, filed an amendment to their joint Schedule 13D with the SEC stating their intention to seek representation on Clarostat's Board of Directors. In early April, the Management Group sent to all Clarostat shareholders a notice of the annual meeting at which the company's directors would be elected and a proxy statement soliciting shareholder votes on behalf of the Management Group's nominees.[2] The proxy statement also advised shareholders that the Ostrau Group had announced its intention to seek election to the Board.[3] Several days later, on April 13, the Ostrau Group sent to all record shareholders a proxy statement advising of its intention to solicit proxies on behalf of its slate of candidates for election to the Board. The statement also revealed that Bertram Ostrau, one of the Ostrau Group's candidates, had been censured, suspended, and fined by the American Stock Exchange in 1967 and had been barred by the SEC in 1969 from being associated with any securities broker or dealer as a result of violations of the federal securities laws.

A week later, the Management Group sent an "important message" to Clarostat shareholders urging reelection of its candidates and opposition to the Ostrau Group's attempt to assume control of the Company. The message referred to Bertram Ostrau's past violations of the securities laws and the sanctions imposed by the SEC and the American Stock Exchange. On April 28, the Ostrau Group sent an "important additional message" to the Clarostat shareholders urging the election of the Ostrau Group candidates. This message highlighted the non-disclosure, prior to the Management Group's initial April 8 proxy statement, of a 1970 agreement between two of the Management Group defendants, Glen E. Swanson and Arthur Richenthal, granting to each a "right of first refusal" during that person's lifetime to purchase the other's Clarostat shares should that person decide to sell, as well as an option to buy such shares upon the other's death. The message urged that after 67 aggregated years of Management Group control of the Company, it was "time for a change," that the Company had failed to pay a dividend over the last 20 years, and that the Company was guided by absentee directors who resided in California while the Company's principal offices were in New Hampshire.

The annual meeting and vote of Clarostat stockholders took place in New York on May 20, 1982. On May 24, the Ostrau Group announced that a preliminary count of the proxies showed its candidates with an extremely narrow lead of less than 1% of all the outstanding shares. On the same day, the Management Group, acting in their

---

1. Plaintiffs' motion for class certification pursuant to Fed.R.Civ.P. 23(c) was adjourned on consent of the parties pending the resolution of this motion to dismiss.

2. The Management Group defendants, all of whom were seeking reelection to the Board, are Glen E. Swanson, at all times President and Chairman of the Board, Russell E. White, at all times Executive Vice President, Arthur Richenthal, at all times Secretary and Treasurer, and Steven F. Gross, at all times a director of the Company.

3. The Ostrau Group defendants seeking election to the Board were Bertram M. Ostrau, Stanley S. Spielman, N. Norman Muller, and Henry J. Egen. The remaining Ostrau Group defendants, all owners of Clarostat stock as of April 1, 1982, are Dorothy Ostrau (the wife of B. Ostrau), Lauren, Susan, and Jonathan Ostrau (children of B. Ostrau), Fincon Enterprises, Inc. (whose controlling stockholder is B. Ostrau) and Stanley and Eleanor Ostrau.

capacity as officers of Clarostat, filed an action in the United States District Court for the District of New Hampshire alleging violations of the federal securities laws on the part of the Ostrau Group in connection with the proxy contest. The complaint sought a temporary restraining order and preliminary injunction enjoining certification of the vote and barring the Ostrau Group candidates from taking office. The Hon. Martin R. Loughlin, United States District Judge for the District of New Hampshire, issued a written opinion two days later finding that Clarostat had shown a likelihood of success on the merits and granting the requested injunctive relief until June 4.

On June 3, one day before Judge Loughlin's order was to have expired, the Management Group announced that Clarostat had agreed to purchase all the shares held by the Ostrau Group for $22.75 per share, a premium of roughly 8⅜ dollars above the 14⅜ closing price of Clarostat on June 1, 1982.[4] The Ostrau Group agreed in return to drop the proxy fight and withdraw its candidates from consideration for election to the Clarostat Board. The agreement provided further that Clarostat would reimburse the Ostrau Group for approximately $201,000 in expenses related to the proxy fight and the subsequent litigation.

The price of Clarostat stock fell 2⅜ points, from 14⅜ to 12, the day of the announcement of the repurchase agreement and traded at between 10 and 12 up to the time of the filing of this action.

Plaintiffs filed their original complaint on June 22, 1982 and their second amended complaint, pursuant to stipulation of the parties and order of the Court, on October 12, 1982. The second amended complaint contains four federal and four state claims

for relief;[5] two of the federal claims are directed to the Ostrau Group and two are directed to the Management Group.

Simply stated, plaintiffs' claim with respect to the Ostrau Group defendants is that they gave the false impression during the course of the proxy contest that they intended to take control of the Company for the best interests of the shareholders when in fact they intended to use the proxies they obtained to coerce a buy-out of their shares at a premium. Count I is brought derivatively on behalf of Clarostat and alleges that the Ostrau Group defendants violated Section 14(a) of the Exchange Act and Rule 14a–9 by falsely indicating in their proxy materials that they were pursuing control of the company in the best interests of the shareholders and by failing to disclose that their real purpose was to coerce a buy-out of their Clarostat shares at a premium. Count III is a derivative claim under Section 10(b) of the Exchange Act and Rule 10b–5 alleging that the Ostrau Group's actions in connection with the sale of their stock to Clarostat constituted fraudulent and deceitful behavior in violation of the Act.

Count IV is a class claim brought against the Management Group under Section 14(a) of the Exchange Act and Rule 14a–9 on behalf of all those who held Clarostat stock between March 25, 1982 and June 3, 1982. The plaintiffs allege that the Management Group failed to reveal in their proxy solicitations that they had been approached by and had received proposals and serious expressions of interest from prospective purchasers with regard to the purchase of a controlling interest of Clarostat at a premium, had refused to consider and discuss such proposals, and had adopted a policy of

---

**4.** During the week following the annual meeting, Clarostat stock ranged in price from a high of 16½ to a low of 14½ following the announcement of Judge Loughlin's opinion. On June 1, Clarostat traded at 14⅜. Trading was suspended the next day pending announcement of the buy-out agreement.

**5.** Plaintiffs' consent to dismissal of Counts II, VI, and VII. Count II was a class claim against

the Ostrau Group defendants under Section 10(b) and Rule 10b–5. Counts VI and VII alleged that the Management Group defendants violated Sections 13(e) and 14(e) of the Williams Act, 15 U.S.C. §§ 78m(e), 78n(e) by their decision as officers and directors of the Company to repurchase the Ostrau Group's Clarostat stock.

refusing to discuss or consider such proposals, all in violation of the proxy disclosure provisions of the Act. The second count charged against the Management Group, Count V, is brought derivatively under Section 10(b) of the Act and Rule 10b–5. It alleges that the Management Group engaged in fraudulent and deceitful acts and transactions with respect to the repurchase of the Ostrau Groups' shares by failing to disclose in its proxy materials its policy of independence and its refusal to consider or discuss offers to purchase Clarostat stock.

The plaintiffs' pendent state claims, Counts VIII–XI, allege that the defendants sold proxies in violation of New York Business Corporation Law and violated their fiduciary duties under state common law by engaging in the repurchase agreement and failing to declare dividends.

## DISCUSSION

### Claims Against the Ostrau Group

■ Plaintiffs' claim against the Ostrau Group under Section 14(a) of the Exchange Act and Rule 14a–9 for alleged misrepresentations and omissions in its proxy solicitations fails to allege the requisite element of "transaction causation." In order to state a private claim under Section 14(a), the plaintiff must allege that the proxy violations in question brought about the actions resulting in the questionable transaction—what is referred to as "transaction causation". *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 381–82 (2d Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *Kamerman v. Pakco Companies, Inc.,* [1978 Transfer Binder] Fed.Sec.L.Rep. ¶ 96,318, at 93,065–067 (S.D. N.Y.1978). That is, in order for the alleged material misrepresentation or omission to form the basis for a securities violation, the proxy solicitation containing the material misrepresentation or omission must be " ' "an essential link in the accomplishment of the transaction" giving rise to the litigation. . . .' " *Schlick v. Penn-Dixie Cement Corp., supra,* 507 F.2d at 383 (quoting *Weiss v. Sunasco, Inc.,* 316 F.Supp. 1197, 1205 (E.D.Penn.1970)); *see also Mills v. Electric*

*Auto-Lite Co.,* 396 U.S. 375, 385, 90 S.Ct. 616, 622, 24 L.Ed.2d 593 (1970) ("The proxy solicitation itself [must be] an essential link in the accomplishment of the transaction.").

Plaintiffs contend that if the Ostrau Group defendants had revealed in their proxy materials their true intention to coerce the buy-out of their shares at a premium, they would have received fewer proxies, resulting in a victory for the Management Group's slate of nominees. Had the Management Group received significantly greater shareholder support, there would have been no need to seek the aid of the New Hampshire District Court in enjoining the election, and the allegedly unlawful repurchase agreement would never have taken place.

■ The courts of this Circuit have rejected this sort of attenuated "but for" causation analysis. *See, e.g., Weisberg v. Coastal States Gas Corp.,* 609 F.2d 650, 654 (2d Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1600, 63 L.Ed.2d 786 (1980); *Kamerman v. Pakco Companies, Inc., supra,* at 93,066 ("Section 14 cannot be interpreted so expansively as to provide for recovery for activities which were not the subjects of the proxy solicitation."); *Limmer v. General Telephone & Electronics Corp.,* [1977–78 Transfer Binder] Fed.Sec.L.Rep. ¶ 96,111 (S.D.N.Y.1977); *Levy v. Johnson,* [1976–1977 Transfer Binder] Fed.Sec.L.Rep. ¶ 95,899 (S.D.N.Y.1977). The purpose of Section 14(a) is to ensure corporate sufferage and to prevent "management or others from obtaining authorization for corporation action by means of deceptive or inadequate disclosure in proxy solicitation." *J.I. Case v. Borak,* 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964). A Section 14 action based on an alleged material misrepresentation or omission in proxy materials therefore should be sustained only when it challenges a transaction which was the subject of the proxy materials, such as approval of a merger agreement or the election of corporate directors. *See Rediker v. Geon Industries, Inc.,* 464 F.Supp. 73, 81 (S.D.N.Y.1978); *Markewich v. Adikes,* 422 F.Supp. 1144, 1146 (E.D.N.Y.1976); *Zilker v. Klein,* 510 F.Supp. 1070, 1074 (N.D.Ill.1981).

The buy-out agreement under attack in this action was not subject to approval by the Clarostat shareholders and was not a subject of the allegedly misleading proxy materials. Nor do plaintiffs seek in their complaint to nullify or enjoin the results of the election that preceded the buy-out agreement.[6] The gist of plaintiffs' claim is that the Ostrau Group defendants breached their fiduciary duty to Clarostat and the shareholders who supported them in their bid for control by their decision subsequent to the election to settle with the Management Group defendants and sell their shares at a premium rather than to litigate the lawfulness of their narrow victory in court. While this may state a claim for breach of fiduciary duty under state law, we reject plaintiffs' efforts to bootstrap a state claim of this type into federal court by characterizing it as a violation of the securities laws. *See Maldonado v. Flynn,* 597 F.2d 789, 796 (2d Cir.1979) ("Efforts to dress-up [state law claims] in a § 14(a) suit of clothes have consistently been rejected. . . ."); *Lewis v. Elam,* [1977–1978 Transfer Binder] Fed.Sec.L.Rep. ¶ 96,013 (S.D.N.Y.1977). The proxy solicitation under attack simply was not an "essential link" in the accomplishment of the repurchase agreement because no shareholder vote was necessary to authorize the agreement on the part of either the Ostrau Group or the Management Group defendants. Indeed, were we to decide otherwise and adopt plaintiffs' interpretation of a proper Section 14(a) cause of action, alleged violations of state fiduciary law on the part of successful (or unsuccessful) corporate nominees subsequent to a deceptive proxy solicitation could nearly always be characterized as a violation of the federal securities law. This view has been rejected as inconsistent with the purpose of the securities laws and the intent of Congress in passing the Securities Act of 1934. *See, e.g., Limmer v. General Telephone & Elec-*

*tronics Corp., supra,* at 92,002; *Levy v. Johnson, supra,* at 91,324; *Zilker v. Klein, supra,* 510 F.Supp. at 1074. On this basis alone, Count I of the complaint must be dismissed.

■ Even if we assume *arguendo* that a sufficient causal nexus exists between the alleged proxy violations and the transaction under attack (and that this case could be distinguished on the basis of the arguably inseparable and intertwined relationship between the two), plaintiffs have failed to plead with particularity sufficient facts supporting their Section 14(a) claim as required by Fed.R.Civ.P. 9(b). *See Rodman v. Grant Foundation,* 608 F.2d 64, 73 (2d Cir. 1979); *Segal v. Gordon,* 467 F.2d 602, 606–10 (2d Cir.1972). Plaintiffs fail to allege in their complaint any specific information or facts that should have been included in the Ostrau Group's proxy materials, and none of the information that was included appears to be at all inconsistent or misleading with regard to the Ostrau Group's subsequent actions. The fact that these defendants chose to settle with management after vigorously pursuing control of the Company, in light of the precarious state of their preliminary election lead and the issuance of the preliminary injunction, is completely consistent with the professed goal in their proxy materials of taking control of the company. Given this factual setting, something more must be pleaded than a conclusory allegation that defendants never intended to win in the first instance. Indeed, the only factual basis for plaintiffs' misrepresentation claim appears to be the buy-out transaction itself. This fact cannot alone support a claim of misrepresentation, for then, as defendants rightly point out, every settlement of a proxy contest by dissident shareholders would become subject to attack in federal court solely by virtue of the fact that the settlement took place.

---

**6.** According to the defendants, the terms of the directors elected at the May 20 meeting have already expired. Clarostat held a special meeting on August 24, 1982, at which time the Management Group directors were reelected by more than 80% of the outstanding shares, in-

cluding the votes of approximately ⅔ of the non-management shares. See Management Group Defendants' Memorandum in Support of Motion to Dismiss the Second Amended Complaint, at 14 n. 8.

■ It is difficult indeed to imagine exactly what it is plaintiffs would have had the Ostrau Group defendants reveal in their proxy materials. There is some suggestion in plaintiffs' opposition papers that the Ostrau Group defendants should have revealed the reservation of their right to sell their shares to Clarostat at all times, which was included in their Amended Schedule 13D filed with the SEC.[7] See Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Second Amended Complaint, at 12 n. *. Even were this alleged with specificity in the complaint as required by Rule 9(b), we find as a matter of law that the omission of this information from the proxy materials is not material under the standard set forth in *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Given all the circumstances as alleged in the complaint, and the fact that this information was properly contained in the Ostrau Group's Schedule 13D Amendment, the addition in the proxy materials of this standard boilerplate language could not have been viewed by any reasonable investor as having "significantly altered the 'total mix' of information made available." The plaintiffs' complaint makes quite clear that it was the emphasis on taking control of the Company that they find misleading and inconsistent with the Ostrau Group's subsequent actions. Yet the reservation of a right to sell their shares is not at all inconsistent with this professed goal. And the plaintiffs have alleged no other material facts that should have been disclosed and that would indicate that the Ostrau Group's intentions were anything other than what they stated in their complaint. In the absence of any particularized allegations inconsistent with the Ostrau Group's intention to seek representation on the Clarostat Board, plaintiffs' Section 14(a) claim must be dismissed for failure to plead a material misstatement or omission with particularity. *See Ross v. A.H. Robins Co.,* 607 F.2d 545, 557–58 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980).[8]

■ Plaintiffs' derivative claim against the Ostrau Group defendants under Section 10(b) and Rule 10b–5 must also fail. Like its Section 14(a) counterpart, plaintiffs' Section 10(b) claim is premised on the allegation that the Ostrau Group defendants engaged in deceptive and manipulative practices in connection with the sale of their shares by stating in their proxy materials that they intended to act in the best interests of the Company when in fact they intended to coerce a buy-out of their shares at a premium.

To the extent plaintiffs' Section 10(b) claim rests on the alleged failure to disclose the Ostrau Group's intentions in their proxy materials, it is subject to the same causation requirements and possesses the same flaws in this regard as plaintiffs' Section 14(a) claim. *See Schlick v. Penn-Dixie Cement Corporation,* 507 F.2d 374, 380 (2d Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). The Section 10(b) claim might be construed more broadly, however, not simply as a challenge to the election transaction leading to the buy-out agreement, but rather as a direct attack

---

7. Amendment No. 3 of the Ostrau Group's Schedule 13D Statement filed with the SEC and dated March 16, 1982 stated in relevant part that the Ostrau Group "reserve[d] the right to sell all or a portion of [its] shares either in the open market, or in privately negotiated transactions, with one or more purchasers, including possibly the Issuer." Amendment No. 3 to the Ostrau Group's Schedule 13D Statement, dated March 16, 1982, attached as Exhibit A to the Management Group Defendants' Memorandum in Support of Motion to Dismiss.

8. The most that can be gleaned from plaintiffs' complaint and supporting papers is that the Ostrau Group should have stated in their proxy materials something to this effect: "While we are soliciting your proxies with the intention to gain control of Clarostat, we reserve the right to pursue our self interest should we fail in this endeavor." We do not think defendants are under an obligation to make explicit in their proxy materials such an obvious and general statement of rational behavior. *Cf. Rodman v. Grant Foundation,* 608 F.2d 64, 71 (2d Cir.1979) (no obligation to reveal "universal" and "obvious" interest on the part of officers and directors in maintaining corporate control).

on the Ostrau Group's failure to disclose their intentions prior to the consummation of the buy-out agreement itself. Even if we were to construe plaintiffs' complaint in this manner, it still fails to state a claim.

A necessary prerequisite to a private cause of action under Section 10(b) and Rule 10b–5 is an allegation of conduct that can be fairly viewed as either deceptive or manipulative. *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 473–74, 97 S.Ct. 1292, 1300, 51 L.Ed.2d 480 (1977). Where full and fair disclosure is made a plaintiff cannot "predicate his federal claim upon an asserted breach of ... state-law fiduciary duties." *Rodman v. Grant Foundation,* 608 F.2d 64, 70 (2d Cir.1979) (citing *Santa Fe Industries, Inc. v. Green, supra* ). Where shareholder approval is not necessary to effectuate the action under attack—as is the case if we view plaintiffs' Section 10(b) claim as specifically directed to the repurchase agreement—full disclosure to a disinterested board of directors is equivalent to full disclosure to the shareholders. *Maldonado v. Flynn,* 597 F.2d 789, 793 (2d Cir. 1979).

Plaintiffs concede that the Management Group defendants, then in control of Clarostat, were not deceived by any actions of the Ostrau Group defendants prior to the consummation of the buy-out transaction. Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Second Amended Complaint, at 16. They contend, however, that the Management Group defendants were not "disinterested" by virtue of their compensation agreements with Clarostat, their financial stake in the transaction, and their desire to perpetuate themselves in office.[9]  *Id.* at 16–17.

The fact that the Management Group defendants were compensated for their services as officers and directors and wished to retain control of the Company is not enough to establish that they were not disinterested. *See Kaplan v. Bennett,* 465 F.Supp. 555, 563–66 (S.D.N.Y.1979); *Falkenberg v. Baldwin,* [1977–1978] Fed.Sec.L. Rep. ¶ 96,086 (S.D.N.Y.1977); *Tyco Laboratories, Inc. v. Kimball,* 444 F.Supp. 292, 297–98 (E.D.Pa.1977). Were this the rule, the nearly universal interest on the part of directors and officers in maintaining control of their company, whether compensated or not, would make their business decisions *per se* subject to attack under the securities laws in the absence of full disclosure, thereby bootstrapping a significant portion of state fiduciary cases into federal court. *See Tyco Laboratories, supra,* at 298. The fact that the Management Group officers and directors were compensated for their services (as are most corporate officers and directors) adds nothing to plaintiffs' allegation that the Clarostat Board was not disinterested.

The fact that the Management Group had significant holdings of Clarostat stock adds little weight to plaintiffs' allegations. If anything, this fact supports the view that the Management Group's pecuniary interests as holders of 37% of the outstanding Clarostat shares were the same as the plaintiff shareholders in this action. In the absence of an allegation of a conflict of interest on the Clarostat Board or of a controlling influence over the officers and directors, the claim of an "interested" Board must fail. *See Kaplan v. Bennett, supra,* 465 F.Supp. at 564; *Falkenberg v. Baldwin, supra,* at 91, 911.

Moreover, as this Court pointed out in *Bolton v. Gramlich,* 540 F.Supp. 822 (S.D.N.Y.1982), even if the Board is considered "interested," the allegedly undisclosed information must be material, in that there must exist a " ' "substantial likelihood' " that a reasonable, disinterested director ... would have found the missing information of " 'actual significance' " in his

---

9.  As of April 1, 1982, the Management Group was receiving annual compensation in the form of salaries, bonuses and/or directors' fees for their duties as officers and directors of Clarostat as follows: Glen E. Swanson: $80,000 per annum; Russell E. White: $55,000 per annum; Arthur Richenthal: $45,000 per annum; Steven F. Gross: $5,000 per annum. Together the four Management Group defendants beneficially owned approximately 37% of the outstanding Clarostat shares. Plaintiffs' Second Amended Complaint, ¶¶ 31, 32.

deliberations...." *Id.* at 837 (quoting *Goldberg v. Meridor*, 567 F.2d 209, 218–19 (2d Cir.1977), *cert. denied*, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978)). In this case, the alleged nondisclosure of the Ostrau Group's intentions to effect a buy-out of their shares would not have affected the decision of a reasonable and disinterested Board considering the efficacy of the buy-out transaction. The Clarostat Board was faced with the decision whether to litigate the results of the contested election or to settle with the Ostrau Group through a buy-out of their shares, regardless of the motivation of the Ostrau Group in seeking election in the first instance. Plaintiffs can hardly be arguing that had a disinterested Board known of the Ostrau Group's desire to be bought out in the first place, they might have refused to agree to the buy-out settlement.

For the above reasons, plaintiffs' action against the Ostrau Group under Section 10(b) and Rule 10b–5 must also fail, and Count III of the complaint must therefore be dismissed.

*Claims Against the Management Group* [10]

■ Plaintiffs allege in Counts IV and V of their complaint that the Management Group violated Sections 14(a) and 10(b) of the Securities Act by failing to reveal in their proxy materials that they had rejected "proposals or serious expressions of interest from potential purchasers of Clarostat" and had "adopted a policy of refusing to discuss and consider" such proposals. As a result, plaintiffs argue that Clarostat shareholders were deprived of an opportunity to sell their shares at a premium.

These allegations, like those brought against the Ostrau Group, lack the causal link to the transaction under attack necessary to state a cause of action. Plaintiffs are not attacking the election of directors, nor are they claiming that the Management Group refused to enter into any specific agreements to sell Clarostat shares as a result of their policy of independence.

Plaintiffs' argue instead that if the Management Group had disclosed their policy of independence and refusal to consider and discuss merger and acquisition proposals, it is likely that the Ostrau Group would have received "a significant margin of victory." Had there been such a margin of victory, plaintiffs contend, the Management Group would have been unable to obtain the temporary injunctive relief in the New Hampshire District Court. And without the close election and the resultant injunctive relief—predicates to the unstable, post-election management situation—the buy-out of the Ostrau Group would never have been effected.

As we noted above with respect to the claims against the Ostrau Group, *see* pp. 162–163, *supra*, this type of "but for" causation has been rejected in the context of Section 14(a) claims. While the alleged causal nexus would provide support for a suit seeking to rescind the reelection of the Clarostat directors or some other action requiring shareholder approval, the alleged proxy violations simply are not an "essential link" in the Board's approval of the buy-out settlement. Plaintiffs' Section 14(a) claim must therefore be dismissed.

■ Plaintiffs' Section 10(b) claim against the Management Group fails to state a claim for somewhat similar reasons. To the extent the Section 10(b) claim in Count V is directed to the election contest for control of the company, and is based solely on the failure to disclose material information in the proxy materials, it is subject to the same causation requirements as plaintiffs' Section 14(a) claim. *See Schlick v. Penn-Dixie Cement Corporation*, 507 F.2d 374, 380 (2d Cir.1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). Thus, even if we assumed the alleged omissions to be material in that a reasonable shareholder might have considered them important in deciding how to vote his proxy, *see Affiliated Ute Citizens v. United States*, 406 U.S. 128, 154, 92 S.Ct.

---

**10.** Defendant Clarostat Manufacturing Co., Inc. joins in the Management Group's motion to dismiss in all respects. Supplemental Affidavit of James M. Davis in Support of Motions of Defendant Clarostat Mfg. Co., Inc., at 2 n. *.

1456, 1472, 31 L.Ed.2d 741 (1972), they are not sufficiently linked in a causal sense to the transaction under attack and the alleged injury, *i.e.*, the buy-out of the Ostrau Group at a premium.

Moreover, when plaintiffs' claims against the Management Group defendants are viewed together with their claims against the Ostrau Group defendants, the absence of a sufficient causal nexus between the alleged misrepresentations in the proxy materials and the transaction under attack becomes clear. On the one hand, plaintiffs contend that had the Management Group fully disclosed all material information, it would have received fewer votes, giving victory to the Ostrau Group. Plaintiffs argue in the same breath that had the Ostrau Group fully disclosed its true intentions, it too would have received fewer votes, giving victory to the Management Group. Thus, the plaintiffs do not allege that one or the other of the two defendant groups would have achieved victory had there been full disclosure. Rather, what is clearly the touchstone of plaintiffs' action is the *closeness* of the final proxy tally, for it was the unstable management situation following the election that led to the eventual buy-out the plaintiffs now seek to rescind. Whether the ultimate victory went to the Management Group or the Ostrau Group—the question the shareholders were asked to decide in the proxy fight—is of little consequence.

■ It is apparent, then, that plaintiffs' real complaint is that both defendant groups breached their fiduciary duties to the shareholders by their subsequent and intervening decisions to spend and receive corporate funds to accomplish the buy-out. The only causal connection between the buy-out agreement and the alleged material omissions is the fact that the alleged fiduciary breach might not have occurred had the vote tilted more decisively toward either group of nominees. As we noted above, this type of causal link, which would turn all post-election fiduciary breaches into federal securities claims, is insufficient to state a claim under either Section 14(a) or Section 10(b), at least where the misrepresenta-

tion or omission is limited to alleged flaws in the proxy materials. *See, e.g., Rosengarten v. International Telephone & Telegraph Corp.,* 466 F.Supp. 817, 827–28 (S.D.N.Y. 1979) (under Section 14(a)) (and cases cited therein); *Rosenbaum v. Klein,* 547 F.Supp. 586, 588–90 (E.D.Pa.1982) (under Section 14(a)).

Even if we were to assume *arguendo* a sufficient causal nexus, as we did with the claims against the Ostrau Group, we find that the plaintiffs have failed to allege any facts or information that the Management Group was obligated to disclose under the federal securities laws. Plaintiffs contend that the Management Group defendants should have revealed that they had received and refused to consider proposals or serious expressions of interest in purchasing a controlling interest in Clarostat. They also maintain that the Management Group should have disclosed its "policy of refusing to discuss and consider" such proposals. Plaintiffs' Second Amended Complaint ¶¶ 74, 78.

■ The securities laws do not obligate corporate management to disclose "mere inquiries or contacts made by those interested in acquiring the corporation or its stock." *Bucher v. Shumway,* [1979–1980 Transfer Binder] Fed.Sec.L.Rep. ¶ 97,142, at 96,302 (S.D.N.Y.1979), *aff'd,* 622 F.2d 572 (2d Cir.), *cert. denied,* 449 U.S. 841, 101 S.Ct. 120, 66 L.Ed.2d 48 (1980). Plaintiffs have failed to allege the existence of any firm offers, ongoing negotiations, or agreements in principle that would require disclosure. In the absence of such an allegation, plaintiffs' claim in this regard must fail, both as a substantive matter, *Bucher v. Shumway, supra; Staffin v. Greenberg,* 672 F.2d 1196, 1205–06 (3d Cir.1982) (and cases cited therein), and as a matter of pleading pursuant to Fed.R.Civ.P. 9(b), *see Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 115 (2d Cir. 1982); *Fuchs v. Swanton,* 482 F.Supp. 83, 91 (S.D.N.Y.1979).

■ Nor was the Management Group under an obligation to disclose their alleged policy of refusing to consider offers to assume control of Clarostat. The Seventh

Circuit rejected a similar claim in *Panter v. Marshall Field & Co.,* 646 F.2d 271 (7th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981), relying in part on the reasoning in *Bucher v. Shumway, supra.* The Court in *Panter* held that:

> The plaintiffs' allegations that [the defendants] rebuffed all acquisition attempts without regard to merit and failed to disclose the existence of an alleged policy so to act, are ... insufficient to create a federal cause of action.... [T]hey simply state a claim for a breach of the fiduciary duty directors owe shareholders under state corporate law. This ·is precisely the type of claim the Supreme Court intended to bar from the federal forum when it announced the rule in *Santa Fe Industries.*

*Panter v. Marshall Field & Co., supra,* 646 F.2d at 289.

The only specific fact that plaintiffs point to with regard to the Management Group's alleged policy of refusing to consider offers for Clarostat stock is the "right of first refusal" agreement between defendants Swanson and Richenthal. Plaintiffs' Second Amended Complaint, ¶ 47. While this information is no doubt material, it was fully disclosed in the Management Group's proxy materials prior to both the election and the buy-out agreement, and indeed was referred to in the Ostrau Group's proxy materials sent to all shareholders. *Id.* Thus, in the absence of any additional allegations of material omissions, plaintiffs' Section 14(a) and 10(b) claims against the Management Group must fail.

## CONCLUSION

■ Plaintiffs' claims under Sections 14(a) and 10(b) of the Securities Act, and Rules 14a–9 and 10b–5 promulgated thereunder, are hereby dismissed for failure to state a claim upon which relief may be granted. Because plaintiffs have failed to state a claim under the federal securities laws, we also dismiss plaintiffs' pendent state claims for lack of subject matter jurisdiction. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218

(1966); *Stromfield v. Great Atlantic & Pacific Tea Co.,* 484 F.Supp. 1264, 1273 (S.D.N. Y.), *aff'd,* 646 F.2d 563 (2d Cir.1980). Defendants' motions to dismiss are granted in all respects.

SO ORDERED.