**MEVC DRAPER FISHER JURVETSON FUND I, INC., d/b/a MVC Capital, Plaintiff,**

**v.**

**MILLENNIUM PARTNERS, L.P., Millenco, L.P., and Karpus Management, Inc., Defendants.**

**No. 03 Civ. 862(LBS).**

United States District Court, S.D. New York.

March 6, 2003.

Melvin A. Schwarz, Dechert LLP, New York City, for Plaintiff.

Richard W. Cohen, Lowey Dannenberg Bemporad & Selinger, P.C., White Plains, NY, for Defendant Millenco, L.P.

Harry S. Davis, Schulte Roth & Zabel LLP, New York City, for Defendant Millennium Partners, L.P.

Edwin M. Larkin, Jaeckle Fleischmann & Mugel LLP, Rochester, NY, for Defendant Karpus Management, Inc.

## OPINION

SAND, District Judge.

In the midst of a hard-fought proxy battle and just days before a shareholder vote scheduled for February 28, 2003, Plaintiff meVC Draper Fisher Jurvetson Fund I, Inc. ("MVC"), whose entire board of directors is up for election, brings this suit against Defendants Millennium Partners, L.P. ("MP"), MillenCo, L.P. ("Millenco"), and Karpus Management, Inc. ("Karpus"), alleging violation of § 12(d)(1)(A)(i) of the Investment Company Act of 1940 (the "ICA") (15 U.S.C. § 80a–12(d)(1)(A)(i)) and §§ 13(d), 14(a), and 16(b) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78m(d), 78n(a), and 78p(b)), and seeking preliminary injunctive relief.[1] Plaintiff claims that Defendants have violated the ICA's prohibition on ownership by one investment company of more than three percent of another investment company's voting stock, and violated the Exchange Act by forming a group for the purpose of buying and voting MVC shares without making the necessary disclosures, and by seeking proxies by means of false or misleading solicitations. Plaintiff requests that Millenco and its affiliates be prevented from voting more than 3% of MVC's

---

1. Plaintiff also alleges other federal securities violations, including violations of §§ 9(a) and 10(b) of the Exchange Act, and seeks extensive permanent relief not at issue in this application.

stock at the upcoming election, and that Millenco and Karpus be required to correct their proxy materials by making the necessary disclosures.

After an expedited discovery and briefing schedule (extended slightly by the blizzard of February 17–18, 2003), the Court heard oral argument on February 19, 2003, and on February 24, 2003, issued an Order denying any injunction. In that Order, the Court stated, "Some of the questions raised in this proceeding are novel and complex and warrant the preparation and filing of an opinion stating in some detail the issues and the bases upon which the Court has reached its conclusions. This Court will issue such an Opinion in the near future." This is that Opinion.[2]

## I. Background

Plaintiff MVC is a closed-end investment company specializing in new-technology venture capital investments, and has elected to be treated as a business development company pursuant to § 54 of the ICA. *See* 15 U.S.C. § 80a–53. MVC's original five-member board included two "interested persons," Peter Freudenthal and John Grillos. Freudenthal served as CEO and chairman of MVC's investment adviser, meVC Advisers, and Grillos was a principal of MVC's sub-adviser, Draper Advisers. The remaining three directors were required by § 56(a) of the ICA to be independent. *See* 15 U.S.C. § 80a–55(a).

The Millennium entities, of which only MP and Millenco are defendants in this matter, are a multibillion dollar complex of companies, each serving different investment functions. Taken together, the Millennium entities constitute MVC's largest shareholder and own roughly 6.7% of its 16,296,800 outstanding shares. Only four of the Millennium entities own MVC stock, however: Millenco, which owns 184,300 shares, or 1.13%; Millennium USA, L.P. ("Millennium USA"), which owns 434,771 shares, or 2.67%; Millennium International, Ltd. ("Millennium International"), which owns 334,729 shares, or 2.05%; and Millennium Global Estate, L.P., which owns 145,700 shares, or 0.89%.[3] (These four entities will henceforth be referred to collectively as the "stockholding Millennium entities." The entire complex, including non-stockholding entities, will be referred to simply as the "Millennium entities." The organization of the Millennium entities will be described in further detail in Part III.C of this Opinion.) Defendant Karpus is a registered investment adviser, and owns 3.9% of MVC's outstanding shares.

MVC's initial public offering raised over $300 million, but many of its initial investments were not successful, and by the end of fiscal year 2002 it had written off over $100 million. For much of the past year, MVC's stock has traded in the neighborhood of $8.00 per share, while its net asset value has declined to around $12.00 per share. This disparity between trading price and net asset value per share attracted the attention of MVC's large shareholders and, in some respects, fomented the present dispute.

At the annual meeting on March 27, 2002, the independent directors of MVC

**2.** Preliminary results of the February 28, 2003, shareholder vote that occurred four days after the Court issued its Order indicate that the slate of directors nominated by Defendants defeated the slate nominated by Plaintiff.

**3.** These quantities and percentages are based on the quantities disclosed in Millenco's De-

finitive Proxy Statement of January 31, 2003. *See* Millenco, L.P. Schedule 14A, Jan. 31, 2003, Deposition of Robert Knapp, Feb. 13, 2003 ("Knapp Dep.") Ex. 9, at 6–7. The quantities and percentages shown on the organizational chart reveal slightly higher totals, presumably due to purchases after January 31. The choice of numbers has no effect on the Court's legal analysis.

proposed renewing the investment advisory agreements with meVC Advisers and Draper Advisers, as well as empowering the board to renew subsequent agreements without shareholder approval. Millenco opposed the proposal, and after a contentious shareholder vote and litigation in Delaware Chancery Court, the contracts were not renewed. Instead, upon the resignation of the non-renewed advisers, MVC converted to an internal management structure, and retained various Draper Advisers personnel as MVC employees.

In August 2002, Millenco returned to Delaware Chancery Court and sued to void the results of MVC's 2001 and 2002 director elections. Millenco alleged that MVC's proxy materials had been misleading because they had failed to disclose that Grillos and two of the nominally independent directors had actually been involved in a second company in which MVC had invested. The Chancery Court granted summary judgment to Millenco, and ordered that new elections be held no later than February 28, 2003. *See Millenco L.P. v. meVC Draper Fisher Jurvetson Fund I, Inc.*, C.A. No. 19523, 2002 WL 31888305 (Del. Ch. Dec. 19, 2002) (revised Dec. 30, 2002) (name corrected Jan. 17, 2002); *Millenco L.P. v. meVC Draper Fisher Jurvetson Fund I, Inc.*, C.A. No. 19523 (Del.Ch. Jan.10, 2003). On January 16, 2003, all of the directors except Grillos resigned, and the board was enlarged to seven members. Because of the combination of the new board seats, resignations, term expirations, and Delaware judgment, all seven board seats are now up for election. Both MVC and Millenco have nominated slates of directors for these positions. Millenco filed its definitive proxy materials on January 31, 2003. MVC initiated this action by Order To Show Cause on February 6, 2003.

## II. Standard for a Preliminary Injunction

 In order to merit preliminary injunctive relief, a party must establish "(1) that it will be irreparably harmed in the absence of an injunction, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of the case to make them a fair ground for litigation, and a balance of hardships tipping decidedly in its favor." *Forest City Daly Hous., Inc. v. Town of North Hempstead,* 175 F.3d 144, 149 (2d Cir.1999) (citing *Genesee Brewing Co. v. Stroh Brewing Co.,* 124 F.3d 137, 142 (2d Cir.1997)). Where the requested injunction will "alter, rather than maintain, the status quo," however, the movant must meet a "more rigorous standard" and evidence a "clear or substantial showing of likelihood of success." *Id.* at 149–50 (quoting *Tom Doherty Assocs. v. Saban Entm't, Inc.,* 60 F.3d 27, 33–34 (2d Cir.1995)) (internal quotation marks omitted). There can be little doubt that the relief requested here–denying Defendants the opportunity to vote a substantial proportion of their shares in the upcoming election–would alter, rather than maintain, the status quo. As will be explained below, the Court finds that Plaintiff has failed to meet its burden of a clear or substantial showing of likelihood of success on any of its claims.

## III. Claims Under the Investment Company Act of 1940

### A. The Antipyramiding Provision

In 1940, Congress passed the original version of the ICA in order to "protect investors who entrusted their savings to others for expert management and diversification of investments." *Rohrbaugh v. Inv. Co. Inst.,* 2002 WL 31100821, *1 (D.D.C. July 2, 2002).[4] A key element of the ICA's plan was the so-called antipy-

---

**4.** *See also Rohrbaugh,* 2002 WL 31100821, at

*1 ("A central purpose of the ICA was to

ramiding provision, which forbade any one investment company from owning more than a certain portion of another investment company. As currently in force and in relevant part, the antipyramiding provision provides:

(d) Limitations on acquisition by investment companies of securities of other specific businesses.

(1)(A) It shall be unlawful for any registered investment company (the "acquiring company") and any company or companies controlled by such acquiring company to purchase or otherwise acquire any security issued by any other investment company (the "acquired company"), and for any investment company (the "acquiring company") and any company or companies controlled by such acquiring company to purchase or otherwise acquire any security issued by any registered investment company (the "acquired company"), if the acquiring company and any company or companies controlled by it immediately after such purchase or acquisition own in the aggregate—

(i) more than 3 per centum of the total outstanding voting stock of the acquired company;

(ii) securities issued by the acquired company having an aggregate value in excess of 5 per centum of the value of the total assets of the acquiring company; or

(iii) securities issued by the acquired company and all other investment companies (other than treasury stock of the acquiring company) having an aggregate value in excess of 10 per centum of the value of the total assets of the acquiring company.

15 U.S.C. § 80a–12(d).

The original purpose of the antipyramiding provision was "to prevent a registered investment company from controlling other investment companies and creating complicated pyramid structures." S. Asia Portfolio, SEC No–Action Letter, 1997 SEC No–Act. LEXIS 419, *7 (Mar. 12, 1997). According to one commentator:

Section 12(d)(1) is intended to eliminate four potential abuses: (i) the acquisition of voting control of one investment company by another, thereby subverting the investment policies of one company to suit those of another; (ii) the layering of sales charges, advisory fees, and administrative costs; (iii) undue influence over portfolio management through the threat of large-scale redemptions and the disruption of the orderly management of the investment company through the maintenance of large cash balances to meet potential redemptions; and (iv) inefficient or overly complex fund holding companies as investment vehicles, thereby resulting in investor confusion.

Joseph R. Fleming, *Regulation of Series Investment Companies Under the Investment Company Act of 1940*, 44 Bus. Law. 1179, 1200–01 (1989) (citing SEC, Public Policy Implications of Investment Company Growth, H.R.Rep. No. 2337, 89th Cong., 2d Sess. 316, 318–20 (1966)).[5]

---

remedy widespread abuses arising from the conflicts of interest among managers of investment companies, who regularly engaged in self-dealing to advance their private pecuniary interests at the expense of shareholders. Investors had relatively little protection under state law against these abuses, and the ICA was Congress's recognition that a federal response was essential."); *id.* at *1 n. 1 ("[The] ICA was a response to the 'fantastic abuse of

trust by investment company management and wholesale victimizing of security holders.'") (quoting *United States v. Deutsch*, 451 F.2d 98, 108 (2d Cir.1971)).

5. *See also S. Asia Portfolio*, 1997 SEC No–Act. LEXIS 419, at *7–*8:

Congress believed that a fund holding company's exercise of control over another investment company could result in a number

It is undisputed that MVC is a business development company, and thus a registered investment company for the purposes of § 12 of the ICA. *See* 15 U.S.C. § 80a–59. It is also undisputed that the four stockholding Millennium entities–Millenco, Millennium USA, Millennium International, and Millennium Global Estate–would each be investment companies within the definition of § 3(a) of the ICA,[6] but that they are exempted therefrom by § 3(c)(7). § 3(c)(7) provides that a company is not an investment company as long as its outstanding securities "are owned exclusively by persons who, at the time of acquisition of such securities, are qualified purchasers, and [the company] is not making and does not at that time propose to make a public offering of such securities." 15 U.S.C. § 80a–3(c)(7)(A). Yet § 3(c)(7) also provides that "[a]n issuer that is excepted under this paragraph shall nonetheless be deemed to be an investment company for purposes of the limitations set forth in subparagraphs (A)(i) and (B)(i) of section 12(d)(1)." 15 U.S.C. § 80a–3(c)(7)(D).[7] Both MVC and the stockhold-

ing Millennium entities are thus subject to § 12(d)(1)(A)(i).

Finally, it is undisputed that the four stockholding Millennium entities together own more than 6.7% of the voting stock of MVC, but that no one of those entities by itself owns more than 3%, and that none of the other Millennium entities–including MP and Millennium Management–own any MVC stock at all.

### B. Private Right of Action

■ As a preliminary matter, Defendants assert that there is no private right of action under § 12(d)(1)(A), and that Plaintiff thus lacks standing to press its claim. This question has previously been addressed by several courts, each of which has found the existence of a private right of action. *See, e.g., Bancroft Convertible Fund, Inc. v. Zico Inv. Holdings, Inc.,* 825 F.2d 731 (3d Cir.1987); *Clemente Global Growth Fund, Inc. v. Pickens,* 705 F.Supp. 958 (S.D.N.Y.1989). Defendants, relying on *Olmsted v. Pruco Life Ins. Co. of New Jersey,* 283 F.3d 429 (2d Cir.2002), counter that these cases belong to an "ancien re-

---

of abuses, including: (1) the pyramiding of voting control in a manner that puts control in the hands of those having only a nominal stake in the controlled investment company, to the disadvantage of the controlled investment company's minority owners; (2) the undue influence over the adviser of the controlled company through the threat of large scale redemptions and loss of advisory fees to the adviser, resulting in the disruption of the orderly management of the company through the maintenance of large cash balances to meet potential redemptions; (3) the difficulty on the part of an unsophisticated shareholder in appraising the true value of his investment due to the complex holding company structure; and (4) the layering of sales charges, advisory fees, and administrative costs.

**6.** § 3(a)(1) of the ICA provides that:

When used in this title, "investment company" means any issuer which–

(A) is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities;

(B) is engaged or proposes to engage in the business of issuing face-amount certificates of the installment type, or has been engaged in such business and has any such certificate outstanding; or

(C) is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment securities having a value exceeding 40 per centum of the value of such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis. 15 U.S.C. § 80a–3(a)(1).

**7.** *See generally* American Bar Ass'n Section of Bus. Law, SEC No–Action Letter, 1999 SEC No–Act. LEXIS 456, at *1–*5 (Apr. 22, 1999).

gime," *id.* at 434 (quoting *Alexander v. Sandoval,* 532 U.S. 275, 287, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001)), whose overthrow is apparent in more recent jurisprudence.

In *Olmsted,* the Second Circuit was faced with the question whether there existed a private right of action under §§ 26(f) and 27(i) of the ICA (15 U.S.C. §§ 80a–26(f) and 27(i)), provisions added to the ICA in 1996 and not otherwise at issue in this case. Beginning with the observation that "[d]etermining congressional intent to create a right of action is ... a matter of statutory interpretation," the court found that the absence of an express private right of action established a "presum[ption] that Congress did not intend one." *Id.* at 432. Next, the court found that this presumption was strengthened by three additional factors: "First, §§ 26(f) and 27(i) do not contain rights-creating language." *Id.* Rather, both sections begin with the phrase "It shall be unlawful...." Here the court quoted *Sandoval* to the effect that "[s]tatutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." *Id.* at 433 (quoting *Sandoval,* 532 U.S. at 289, 121 S.Ct. 1511) (internal quotation marks omitted). Second, the court noted that § 42 of the ICA (15 U.S.C. § 80a–41) provides for enforcement by the SEC, and added that "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Id.* at 433 (quoting *Sandoval,* 532 U.S. at 290, 121 S.Ct. 1511). Third, the court observed that in 1970 Congress added § 36(b) (15 U.S.C. § 80a–35(b)) to the ICA, providing an express private right of action for investors to sue advisers for breach of fiduciary duties. "Congress's explicit provision of a private right of action to enforce one section of a statute suggests that omis-

sion of an explicit private right to enforce other sections was intentional." *Id.*

Application of this inquiry to § 12(d)(1)(A) leads to results on all fours with the results obtained in *Olmsted.* First, § 12(d)(1)(A) does not provide an express private right of action, leading to a presumption that Congress did not intend one. Second, § 12(d)(1)(A) does not contain any rights-creating language, but, like §§ 26(f) and 27(i), begins with the phrase "It shall be unlawful...." Third, § 42 authorizes the SEC to enforce § 12(d)(1)(A) just as it authorizes the SEC to enforce the rest of the ICA. Finally, Congress's provision of an express private right of action in § 36(b) compels a negative inference in this case similar to the one it compelled in *Olmsted.* Following *Olmsted,* then, the Court finds a strong presumption that Congress did not intend to provide a private right of action under § 12(d)(1)(A).

Plaintiff raises various arguments in an attempt to overcome this presumption. First, Plaintiff notes that numerous federal court decisions have found implied private rights of action under the ICA, including numerous decisions after the Supreme Court's doctrinal shift on implied rights began in the late 1970's. The plaintiffs in *Olmsted* raised the same argument and relied on the same cases, provoking the Second Circuit's declaration that "[p]ast decisions reflecting judicial willingness to make effective statutory purpose in the context of implied rights of action belong to an ancien regime." *Olmsted,* 283 F.3d at 434 (quoting *Sandoval,* 532 U.S. at 287, 121 S.Ct. 1511) (internal quotation marks omitted); *see also id.* at 434 n. 4 (collecting cases).

Next, Plaintiff attempts to undercut the second prong of *Olmsted'*s inquiry by pointing out that because "[t]he express effect of Section 12(d) is *to protect invest-*

*ment companies such as MVC,"* Pl. Trial Mem. at 10 (emphasis in original) (citing 15 U.S.C. § 80a–1(b)(4)), the statute does indeed focus on the protected party. Yet the very fact that Plaintiff is compelled to widen its search to encompass the first, preambulary section of the ICA is alone enough to undermine the point: once one takes into account § 1, it is largely impossible to distinguish one operative section of the Act from another for the purposes of the "focus" inquiry envisioned in *Olmsted* and *Sandoval.*[8]

Next, Plaintiff focuses on the last prong of the *Olmsted* court's inquiry, asserting that the express private remedy in § 36(b) of the ICA ought not connote a lack of congressional intent to provide an implied private remedy in other sections. In support of this argument, Plaintiff relies on *Fogel v. Chestnutt,* 668 F.2d 100 (2d Cir. 1981), which permitted a private suit under the ICA. Judge Friendly's opinion in *Fogel* declined to draw any negative inference from the presence of § 36(b) on the basis that the section had been added to the ICA in 1970 as a result of an SEC proposal, and that "[s]urely the last thing the SEC intended was the abolition of implied causes of action which the courts had recognized under other sections of the ICA." *Id.* at 111. Notably, this same argument was raised in *Olmsted,* where the court distinguished *Fogel* on the basis that "in this case we interpret sections added [to the ICA] *after* Congress created the private right of action." *Olmsted,* 283 F.3d at

433 n. 3 (emphasis added). Thus, even assuming along with *Fogel* that "when Congress added § 36(b) to the ICA in 1970 it did not intend to overrule previous decisions recognizing implied rights of action in the statute," the court found that such an intent could have no bearing on §§ 26(f) and 26(i), which were only added to the ICA in 1996. *Id.*

Plaintiff asserts that this case falls closer to *Fogel* than to *Olmsted* because the antipyramiding provisions of § 12(d)(1) were present in the original 1940 version of the ICA. The Court thinks this assertion overstates the current force of *Fogel:* the Second Circuit characterized *Fogel* as merely assuming that § 36(b) did not overrule the various pre–1970 decisions recognizing implied rights of action under the ICA. But the first decision recognizing a right of action under § 12(d)(1) of the ICA–the district court decision affirmed by the Third Circuit's opinion in *Bancroft* – did not appear until 1987, seventeen years *after* Congress added § 36(b). This Court may thus continue to assume, along with *Fogel* and *Olmsted,* that "when Congress added § 36(b) to the ICA in 1970 it did not intend to overrule previous decisions recognizing implied rights of action in the statute," and still make the same negative inference with regard to § 12(d)(1).[9]

Finally, Plaintiff points to the legislative history accompanying the Small Business Investment Incentive Act of 1980 (the "1980 Act"), which amended the ICA by, *inter alia,* subjecting business develop-

---

**8.** Indeed, the Second Circuit concluded that §§ 26(f) and 27(i), which prohibit unreasonable investment fees, focus on "the person regulated rather than the individuals protected" even though § 1 of the ICA specifically targets the harms to investors from unscrupulous management of their funds. *Compare Olmsted,* 283 F.3d at 433, *with* 15 U.S.C. § 80a–1(b)(2).

**9.** Two further points weaken Plaintiff's argument: First, even if the Court declined to make the negative inference it now makes, it would dismantle only one of the interpretive barricades erected against a restoration of the ancien regime of implied rights, without adding any new force in support of such a right. Second, the Court notes that *Olmsted* specifically declined to "express [an] opinion on the current validity" of *Fogel,* even in this limited context. *Olmsted,* 283 F.3d at 433 n. 3.

ment companies such as MVC to § 12. The House Committee Report accompanying the Act reads:

> The Committee ·wishes to make plain that it expects the courts to imply private rights of action under this legislation, where the plaintiff falls within the class of persons protected by the statutory provision in question. Such a right would be consistent with and further Congress' intent in enacting that provision, and where such actions would not improperly occupy an area traditionally the concern of state law. In appropriate instances, for example, breaches of fiduciary duty involving personal misconduct should be remedied under Section 36(a).

H.R.Rep. No. 96–1341, at 29 (1980), reprinted in 1980 U.S.C.C.A.N. 4800, 4811. This legislative history was brought to the attention of the *Olmsted* court, which stated that "[w]here the text of a statute is unambiguous, judicial inquiry is complete except in rare and exceptional circumstances, and legislative history instructive only upon the most extraordinary showing of contrary intentions." *Olmsted*, 283 F.3d at 435 (quoting *Garcia v. United States*, 469 U.S. 70, 75, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984)) (internal quotation marks and alteration omitted). Given that the Report was prepared by a single House committee, and that the relevant statutory provisions were added sixteen years later, the court found ·no such "extraordinary showing."

Plaintiff asserts that the Report is more relevant to § 12(d)(1) "since the provisions at issue here are among the very ones that the quoted language explicitly addressed." Pl. Trial Mem. at 12. But Plaintiff's assertion is strictly accurate only in the sense that the Report addressed the question of private rights under the ICA as a whole. Whereas the Report took as its example § 36(a) of the ICA, it never specifically mentioned the question of implied rights under § 12. *Cf. Young v. Nationwide Life Ins. Co.*, 2 F.Supp.2d 914, 926 (S.D.Tex. 1998) (finding an implied right of action under § 36(a), in part on the basis of the 1980 Report). Moreover, the 1980 Act neither created nor altered the substantive provisions of § 12(d)(1). Rather, it carved out a group of investment companies, labeled them "business development companies," and *excepted* them from much of the ICA–while specifically *leaving them sub-. ject* to § 12(d)(1). *See* Pub.L. 96–477, 94 Stat. 2275, 2285.[10]

---

10. Indeed, far from viewing itself as modifying the antipyramiding provision, or even extending its reach, the House Report suggests that the 1980 Act was simply intended to maintain the antipyramiding *status quo*. *See* H.R.Rep. No. 96–1341, at 21–22, 1980 U.S.C.C.A.N. at 4803–4 ("Business development companies . . . ., to the extent that they are publicly-held, are subject to detailed regulation under the Investment Company Act of 1940, and, under some circumstances, their management may be subject to the Investment Advisers Act of 1940. This bill recognizes that public venture capital pools exhibit some substantial differences from investment companies that invest in more liquid securities. It therefore seeks to remove burdens on venture capital activities that might create unnecessary disincentives to the legitimate provision of capital to· small businesses.

While recommending these statutory changes, the Committee is cognizant of the need to avoid compromising needed protection for investors in the name of reducing regulatory burdens. . . . The Investment Company Act was enacted to eliminate the widespread abuses and breaches of fiduciary duties that were uncovered in unregulated investment companies. . . . Consequently, this legislation is intended to preserve to the fullest possible extent these types of protections, while at the same time reducing unnecessary regulatory burdens."); *see also* 15 U.S.C. § 80a–6(f) (excepting business development companies from §§ 1 through 53 of the ICA "except to the extent provided in sections 59 through 65"); 15 U.S.C. § 80a–59 (applying § 12 to business development companies "[n]otwithstanding the exemption set forth in section 6(f)").

For Plaintiff's argument to carry the day, then, the Court would have to give decisive weight to one committee's interpretation of earlier provisions of the ICA–provisions the 1980 amendments essentially left unaltered, and provisions which had never previously been found by any court to give rise to a private right of action–over the strong, textually-derived presumption against any implied private right of action. This the Court declines to do. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 185, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) ("[W]e have observed on more than one occasion that the interpretation given by one Congress (or a committee or Member thereof) to an earlier statute is of little assistance in discerning the meaning of that statute.") (quoting *Public Employees Ret. Sys. of Ohio v. Betts*, 492 U.S. 158, 168, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989)) (internal quotation marks omitted).[11]

## C. Substantive Claim

Because the Court finds that there is no private right of action under § 12(d)(1)(A), it is plain that Plaintiff cannot succeed on that count. Nonetheless, the Court finds it prudent to examine Plaintiff's claim on the merits as well. So doing, the Court finds that Plaintiff has not made a clear or substantial showing that it would likely succeed in proving Defendants in violation of the ICA.

■ Plaintiff claims that by virtue of their aggregate ownership of more than 3% of MVC's voting stock, the Millennium Defendants have violated § 12(d)(1)(A)(i) of the ICA, which, as previously noted, prohibits any investment company, together with "any company or companies controlled by it," from acquiring more than 3% of the voting stock of a registered investment company. The ICA defines control as "the power to exercise a controlling influence over the management or policies of a company, unless such power is

11. Plaintiff also raises a cognate argument that "some additional weight ... can be given to the fact that Congress did not say or do anything contrary to the existing, unanimous precedent implying private claims under Section 12(d)(1) when amending those provisions in 1996." Pl. Trial Mem. at 13 n. 8 (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 381–82, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982)). Plaintiff is correct that when Congress amended the ICA in 1996–adding, *inter alia*, the exception in § 3(c)(7) for companies like the Millennium entities whose investors are qualified purchasers, but still subjecting those companies to § 12(d)(1)(A)(i)–decisions including *Bancroft* and *Clemente* had already located implied rights of action under § 12(d)(1). The Supreme Court in *Sandoval*, however, undercut much of *Curran's* implicit ratification theory, holding that "we recently criticized *Curran's* reliance on congressional inaction, saying that 'as a general matter ... [the] argument deserves little weight in the interpretive process.'" *Sandoval*, 532 U.S. at 292, 121 S.Ct. 1511 (quoting *Central Bank*, 511 U.S. at 187,

114 S.Ct. 1439). The *Sandoval* Court then added that "[W]hen, as here, Congress has not comprehensively revised a statutory scheme but has made only isolated amendments, we have spoken more bluntly: 'It is impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional approval of the Court's statutory interpretation.'" *Id.* at 292–93, 121 S.Ct. 1511 (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 175 n. 1, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989)) (internal quotation marks omitted). Beyond the general criticism of *Curran*, the Court criticized plaintiffs' application of the implicit ratification theory to their case, because the amendments in question had little to do with implied causes of action. *Id.* at 292, 121 S.Ct. 1511.

Because the 1996 amendments to the ICA similarly had little to do with implied rights of action under § 12(d)(1)(A), this Court need not characterize those amendments as either "comprehensive" or "isolated" in order to conclude that Plaintiff's argument invoking congressional silence fails.

solely the result of an official position with such company." 15 U.S.C. § 80a–2(a)(9). Given the undisputed facts outlined in Part III.A above, the only remaining question is whether MP or Millenco, together with "any company or companies controlled by" them, own in the aggregate more than 3% of MVC's voting stock.

Defendants argue that the corporate organization of the Millennium entities compels a negative answer to this question. Because this structure is somewhat complex, the Court provides this brief description; the Court also appends to this Opinion an organizational chart provided by Defendants at the February 19 hearing. See Def. Ex. B.[12] In essence, the various entities are arrayed in a so-called master-feeder system.[13] The three feeder funds–Millennium USA, Millennium International, and Millennium Global Estate–serve as the portals of entry for investors, and each specializes in a distinct clientele: Millennium USA focuses on domestic investors; Millennium International focuses largely on off-shore investors; and Millennium Global Estate focuses on insurance company accounts. Each of the feeder funds owns a limited partnership stake in the master fund, MP, which typically holds investment securities on account for the feeders (and, in turn, their clients) in proportion to their partnership stakes. Notably, the MVC stock at issue in this case is not held by the master fund, but by each of the feeders themselves, as well as by Millenco. MP, in turn, holds a limited partnership stake in Millenco, a registered broker/dealer which typically performs most of the investment transactions on behalf of its upstream affiliates. None of the feeder funds controls MP, however, because a sixth company, Millennium Management, serves as MP's general partner;[14] similarly, MP does not control Millenco because Millennium Management also serves as Millenco's general partner. Millennium Management also serves as the general partner, either directly or indirectly, of each of the feeder funds. Finally, Millennium Management serves (directly or indirectly) as the managing partner or investment manager of each of the investment funds, which means that it alone–and in that capacity alone–has the authority to make stock purchase, sale, and voting decisions. See Deposition of Robert Knapp, Feb. 13, 2003 ("Knapp Dep."), at 15–16, 21.[15] Millennium Management itself is apparently controlled entirely by a single human being, the managing member Israel Englander. Knapp Dep. at 10; Deposition of Terry Feeny, Feb. 14, 2003 ("Feeny Dep."), at 28–29.[16] The upshot of this

12. Plaintiff conceded the accuracy of these charts at oral argument. See Tr. Oral Argument, Feb. 19, 2003, at 73.

13. Because none of the Millennium entities are registered investment companies, they did not need to conform their structure to the ICA's statutory provision covering master-feeder funds. See 15 U.S.C. § 80a–12(E).

14. A company called Englander (Cayman Islands) Ltd. also serves as general partner to MP.

15. For a general discussion of the organization of the various entities, see Deposition of Terry Feeny, Feb. 14, 2003 ("Feeny Dep."), at 134–36. See also Third Amended and Restated Limited Partnership Agreement of Mil-

lennium Partners, L.P., Knapp Dep. Ex. 3; Second Amended and Restated Agreement of Limited Partnership of MillenCo, L.P., Feeny Dep. Ex. 3; Fourth Amended and Restated Limited Partnership Agreement of Millennium USA, L.P., Def. Ex. C; Memorandum of Association of Millennium International, Ltd., Def. Ex. D; Amended and Restated Limited Partnership Agreement of Millennium Global Estate, L.P., Feeny Dep. Ex. 6; Millennium USA, L.P. Confidential Memorandum, Feeny Dep. Ex. 2; Millennium International, Ltd. Confidential Memorandum, Feeny Dep. Ex. 4; Millennium Global Estate, L.P. Confidential Memorandum, Feeny Dep. Ex. 5.

16. See also Deposition of Robert Knapp, Oct. 15, 2002, at 9 ("Essentially I think the general

structure is that none of the four stock-holding Millennium entities controls, directly or indirectly, any of the other stockholding entities, and therefore none can be said to own more than 3% of MVC's voting stock. On this basis, Defendants argue that § 12(d)(1)(A) does not apply of its own terms.

In support of this argument, Defendants point out that if the ICA were concerned with affiliated investment companies, investment companies under common control, or investment companies with the same adviser–into each of which categories the stockholding Millennium entities would likely fall–owning in the aggregate more than 3% of another investment company's stock, the ICA would have said so.

Section 12(d)(1)(F), for example, provides certain registered investment companies with an exemption from other anti-pyramiding provisions not at issue in this case, but only on the condition that, *inter alia,* "not more than 3 per centum of the total outstanding stock of [the acquired company] is owned by such registered investment company *and all affiliated persons* of such registered investment company." 15 U.S.C. § 80a–12(d)(1)(F)(i) (emphasis added).[17] "Affiliated person," in turn, is defined by the ICA as including "any person directly or indirectly controlling, controlled by, or *under common control with,* such other person." 15 U.S.C. § 80a–2(a)(3)(C) (emphasis added). *See, e.g.,* Lazard Freres Asset Mgmt., SEC No–Action Letter, 1997 SEC No-Act. LEXIS 48, at *2 (Jan. 10, 1997) ("Section 12(d)(1)(F) provides an exception from the limitations of Section 12(d)(1)(A) with respect to securities purchased or otherwise acquired by a registered investment company, provided that ... the registered investment company and all its affiliated persons own no more than 3% of the total outstanding stock of the acquired investment company."); FundTrust, SEC No–Action Letter, 1987 SEC No-Act. LEXIS 2085, at *2–*3 (May 26, 1987) (noting in a discussion of § 12(d)(1)(F) that "under common control" is a subset of "affiliated"); *Olesh v. Dreyfus Corp.,* 1995 WL 500491, *15 (E.D.N.Y. Aug. 8, 1995) (observing that under the ICA the term "controlled" is significantly narrower than the term "affiliated").

Similarly, § 12(d)(1)(C) provides that no investment company may acquire stock in any registered closed-end investment company if by doing so it would exceed 10% ownership when aggregated not only with

---

partner controls, meaning Israel Englander controls all the entities.").

**17.** Section 12(d)(1)(F) provides in its entirety: (F) The provisions of this paragraph shall not apply to securities purchased or otherwise acquired by a registered investment company if–
(i) immediately after such purchase or acquisition not more than 3 per centum of the total outstanding stock of such issuer is owned by such registered investment company and all affiliated persons of such registered investment company; and
(ii) such registered investment company has not offered or sold after January 1, 1971, and is not proposing to offer or sell any security issued by it through a principal underwriter or otherwise at a public offering price which includes a sales load of more than 1 1/2 per centum.
No issuer of any security purchased or acquired by a registered investment company pursuant to this subparagraph shall be obligated to redeem such security in an amount exceeding 1 per centum of such issuer's total outstanding securities during any period of less than thirty days. Such investment company shall exercise voting rights by proxy or otherwise with respect to any security purchased or acquired pursuant to this subparagraph in the manner prescribed by subparagraph (E) of this subsection.
15 U.S.C. § 80a–12(d)(1)(F).

companies "controlled by it," but also with "investment companies *having the same investment adviser,* and companies controlled by such investment companies." 15 U.S.C. § 80a–12(d)(1)(C) (emphasis added).[18] *See* Mutual Series Fund Inc., SEC No–Action Letter, 1995 SEC No–Act. LEXIS 838, *3–*5 (Nov. 7, 1995) (holding that each series of a series investment fund was the "functional equivalent of a separate investment company," and that the SEC would aggregate the individual series' ownership of stock in other investment companies only for the purposes of the 10% limit of § 12(d)(1)(C), and not for the 3% limit of § 12(d)(1)(A)); *see also id.* at *2 ("By its terms, Section 12(d)(1)(A) does not require the investments of one registered investment company to be aggregated with the investments of any other registered investment company, including another investment company in the same fund complex or advised by the same investment adviser or manager.").

The Court find this argument persuasive. Congress in enacting the ICA was clearly cognizant of the myriad relationships investment companies might bear to one another, and chose to apply the 3% restriction of § 12(d)(1)(A)(i) only to companies that controlled each other, and not to companies under common control.

Plaintiff makes several objections to this textual argument. First, Plaintiff relies on the fact that Defendants have stated publicly, at various points, that MP is Millenco's parent company. *See, e.g.,* Knapp Dep. at 47–48; Feeny Dep. at 5. Similarly,

Defendants' proxy filings and 13D filings have stated that Millenco "owns" and has "sole dispositive power" over all of the MVC stock held by the various Millennium entities. *See, e.g.,* Millenco, L.P. Schedule 13D, Feb. 10, 2003, Knapp. Dep. Ex. 5. None of these "admissions" are particularly relevant to the antipyramiding provision, however, which is concerned neither with public statements nor public filings. Put simply, to the extent that the statements in question suggest that, within the meaning of the ICA, MP controls Millenco, or Millenco controls all 6.7% of MVC stock held by the four stockholding Millennium entities, the statements are incorrect.[19]

Second, Plaintiff argues that MP in fact controls all of the MVC shares, through the person of Robert Knapp. Knapp testified at his deposition that his title is Managing Director of MP. Knapp Dep. at 3–5, 11. He also testified that he is likely the only human being to make voting, purchase, and sale decisions for all of the MVC stock held by the Millennium entities. *Id.* at 47–49. But the deposition evidence as a whole made clear that at the organizationally complex Millennium offices (where most of the entities share a single address) titles are of little practical importance, and that Knapp wears multiple hats on behalf of various entities at various times. Knapp Dep. at 5, 267; Feeny Dep. at 5, 9, 23.[20] Crucially, Knapp testified that whenever he makes voting or dispositional decisions regarding MVC stock, he does so on behalf of the investment manager or managing partner, Mil-

---

**18.** It bears mentioning that because the Millennium entities are exempt from the definition of "investment company" under § 3(c)(7) of the ICA, neither § 12(d)(1)(C) nor § 12(d)(1)(F) is likely to apply to them. This factor does not, of course, undercut Defendants' textual argument.

**19.** For the impact such potentially incorrect statements might have on Defendants' liability

under other provisions of the securities laws, see *infra* note 30.

**20.** *See* Thomas Lee Hazen, 3 *The Law of Securities Regulation* at 691–93 (noting that it is not usual for the investment adviser, who is often the sponsor of a fund, to operate the entire business of the fund, including providing personnel and office space).

lennium Management, and not on behalf of MP or any of the stockholding Millennium entities. Knapp Dep. at 11, 40, 48–49; *id.* at 266 ("All of my investment decisions are made on behalf of the investment manager."); Feeny Dep. at 11. In fact, pursuant to their organic documents, the other entities (and their employees) are not *authorized* to make any such decisions on their own behalf.[21] Knapp's authority and title therefore do not establish that MP (or any of the other stockholding Millennium entities, for that matter) pulled any of the relevant strings.

Third, Plaintiff suggests that the result of Defendants' reading of the statute would be in clear contravention of the purposes of the antipyramiding provision, specifically the provision's goal of limiting "control of investment companies ... unduly concentrated through pyramiding or inequitable methods of control." 15 U.S.C. § 80a–1(b)(4).[22] According to Plaintiff, the antipyramiding provision would be illusory if individuals like Englander could avoid it simply by allocating their shares among various controlled sub-corporations. Indeed, Terry Feeny freely acknowledged at his deposition that most of the MVC shares currently held by the stockholding Millennium entities were originally purchased by Millenco and then parceled out to the feeder funds, in part to keep each

entity under the 3% limit. *See* Feeny Dep. at 34, 41–43.

This argument misses two important points, however. First, the ICA's effect is not as illusory as Plaintiff makes it out to be. Millennium Management's (and thus Englander's) control over the MVC stock at issue in this case derives not from its ownership of the stock, but from its role as managing partner or investment manager of the companies that own it. In this capacity, Millennium Management cannot simply dispose of MVC stock at one man's whim–it is bound by both contractual and fiduciary duties to the interests of the ultimate investors.[23] Moreover, the undisputed evidence indicated that the stockholding feeder entities are not merely empty shells for Englander's interests, but have discrete identities and investors with different objectives.[24] In short, each "operates, for investment purposes, as a separate investment company." *Mutual Series Fund,* 1995 SEC No–Act. LEXIS 838, at *3.

The SEC has permitted companies to surpass the 3% limit in an analogous situation, that of multiple series within one series investment company. *See id.* In *Mutual Series Fund,* the SEC determined that it would aggregate the various series' ownership of stock in other investment companies only for the purposes of the

---

**21.** *See* sources cited *supra* note 15.

**22.** *See also supra* note 5 and accompanying text (discussing the policies underlying the antipyramiding provision); 3 Hazen at 688.

**23.** *Cf.* 3 Hazen at 691–93 (noting that because of the potential abuse by investment advisers of registered investment companies, Congress required that they be bound both by written contract and by fiduciary duties).

**24.** *See* Knapp Dep. at 40 ("I can say that when I invest, I'm investing on behalf of our three funds, Millennium Global, Millennium International, Millennium U.S.A. If I know they exist and then I know I need to take into

consideration certain factors when I make my investments."); *see also* Fleming, 44 Bus. Law. at 1201 n. 123 ("Of course, separate, nonseries-type investment companies in an investment company complex with a common investment adviser might be able to exert the same type of influence and control through parallel investment [as that which the ICA wished to avoid via the 3% limit]. However, the boards of directors of these companies would, unlike a single series company, be distinct bodies (although perhaps with interlocking directors), each having fiduciary responsibilities to its own shareholders.").

10% limit of § 12(d)(1)(C) (applied to companies with the same adviser), and not for the purposes of the 3% limit of § 12(d)(1)(A). In essence, the SEC found, "a series is the functional equivalent of a separate investment company and ... should be deemed a separate investment company in applying the various limitations and restrictions imposed by the 1940 Act." *Id.* at *3–*4.[25] At least one commentator has suggested that this policy is unwise, for essentially the reasons cited by Plaintiff today. *See* Fleming, 44 Bus. Law. at 1201–2.[26] But the SEC, which was certainly aware of this argument, chose not to aggregate ownership for the 3% limit in *Mutual Series Fund. See Mutual Series Fund*, 1995 SEC No–Act. LEXIS 838, at *3 n. 4 (citing Fleming's article but ignoring his recommendation). To the extent that aggregated control of this type is perfectly legitimate under the ICA, Plaintiff's policy argument has therefore already been implicitly rejected by the SEC and is inconsistent with the ICA.

Second, the argument proves too much. It has long been apparent that investment advisers essentially control their client funds. *See, e.g., In the Matter of Steadman Security Corp.*, Exchange Act Release No. 13695; Investment Company Act Release No. 9830; Investment Advisors Act Release No. 593, 1977 SEC LEXIS 1388, *56 (June 29, 1977), *rev'd in part on other grounds sub nom. Steadman v. SEC*, 603 F.2d 1126 (5th Cir.1979), *aff'd* 450 U.S. 91, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981) ("[T]he term 'investment adviser' is to some extent a misnomer. It is a time-honored misnomer enshrined in the Act which borrowed its vocabulary from that of the pre–1940 investment company industry. The so-called 'adviser' is no mere consultant. He is the fund's manager.... Hence the investment adviser almost always controls the fund. Only in the very rare case where the adviser's role is simply that of advising others who may or may not elect to be guided by his advice ... can the adviser realistically be deemed not in control."). Nevertheless, as has been seen, funds with common advisers are not subject to the 3% limit of § 12(d)(1)(A)(i). Rather, no matter how common their effective control, such funds are merely affiliates. *See, e.g., id.* at 919–20 ("Ameri–Fund was simply a portfolio of securities. To control that portfolio (and [the adviser] had sole investment discretion with respect to it) was to control Ameri–Fund.... That made Ameri–Fund an affiliated person of an affiliated person of [other companies advised by the same adviser]."); *see also* 15 U.S.C. § 80a–12(d)(1)(C) (limiting companies with the

---

**25.** Plaintiff argues that the *Mutual Series Fund* no-action letter is distinguishable because it deals with series funds rather than separate companies controlled by the same general partner. The Court does not deny this distinction, merely its relevance to the principle of law at issue, which is that several funds sharing indicia of common control do not for that reason control one another for the purposes of § 12(d)(1)(A)(i). Plaintiff also points out that the no-action request in *Mutual Series Fund* was limited to investments by open-end funds in closed-end funds, but again the Court does not find this distinction particularly relevant, and in any case the SEC did not focus on that fact in its letter. *See also FundTrust*, 1987 SEC No–Act. LEXIS 2085

(treating different portfolios of a single series fund as different companies for the purposes of § 12(d)(1)(F)).

**26.** Fleming argues that the 3% limit, which is designed to minimize control by one investment company over another, should be applied not to each individual series but to the company as a whole: "If the restriction on an investment company not acquiring more than three percent of another company's voting stock is applied to each series of the acquiring company individually, then an acquiring company with multiple series could, in the aggregate, control the acquired company." Fleming, 44 Bus. Law. at 1201.

same investment adviser to 10% control over another investment company, in certain circumstances).[27]

In sum, though Plaintiff's policy argument does have a superficial appeal, the Court finds that it cannot overcome the clear textual mandate of § 12(d)(1)(A)(i) of the ICA, or the interpretations of that provision offered by courts, commentators, and the SEC. By contrast, Plaintiff offers no independent support whatsoever for its interpretation of the antipyramiding provision.

## IV. Claims Under the Securities Exchange Act of 1934

### A. Section 13(d) and Rule 13d–5

■ MVC also seeks injunctive relief on its claim that Millenco and Karpus agreed to act together for the purpose of "acquiring, holding, or disposing of" their MVC stock, thus forming an undisclosed group in violation of § 13(d) of the Exchange Act. 15 U.S.C. §§ 78m(d). Specifically, MVC alleges that a so-called pattern of alternating stock purchases by Millenco and Karpus indicates that the companies acted in concert to keep MVC's stock price artificially low while they were amassing their shares. MVC also alleges that Millenco's proxy materials, combined with various communications between Millenco and Karpus, reveal that the companies have agreed to pool their votes in the upcoming director elections. Although acting as a group is not prohibited *per se*, § 13(d)

requires any group acquiring in excess of 5% of a corporation's stock to make certain public disclosures via Schedule 13D. It is undisputed that Millenco and Karpus each made the requisite public disclosures on individually filed 13D's; the only question at issue here is whether they were required to reveal in these filings that they were acting as a group.

Subsection 13(d)(3) states that "[w]hen two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this subsection." 15 U.S.C. § 78m(d)(3). To implement this subsection, the SEC promulgated Rule 13d–5, which defines beneficial ownership by a "group":

> When two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of sections 13(d) and (g) of the Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons.

17 C.F.R. § 240.13d–5(b)(1).

The "key inquiry" for purposes of § 13(d) is "whether [Defendants] agree[d] to act together for the purpose of acquiring, holding, voting or disposing of [Plain-

---

**27.** Another commentator has written:

> As a related matter, despite its goal of constraining financial power, the antipyramiding provision does nothing to address the power of the companies that sponsor and manage mutual funds. While Congress has long been concerned with the harmful effects that might arise from the excessive size of funds, it has not considered whether the same harms might arise from the growth of fund complexes and the resulting ability of a single advisory company to con-

> trol the assets of all the funds in that group.... Given the adviser's unchallenged authority over each fund it advises, the harms perceived from concentrated financial power at the fund complex level seem no less worrisome that those at the fund level.
>
> Roger M. Klein, *Who Will Manage the Managers?: The Investment Company Act's Antipyramiding Provision and its Effect on the Mutual Fund Industry.* 59 Ohio St. L.J. 507, 534–35 (1998).

tiff's] common stock." *Morales v. Quintel Entm't, Inc.,* 249 F.3d 115, 122 (2d Cir. 2001) (internal quotation marks omitted). *Morales* further explained the standards governing this inquiry, which guide the Court's determination here:

Whether the requisite agreement exists is a question of fact. The agreement may be formal or informal and may be proved by direct or circumstantial evidence. Moreover, the alleged group members need not be committed to acquiring, holding, voting, or disposing of equity securities on certain specified terms, but rather they need only have combined to further a common objective regarding one of the just-recited activities. In short, we must examine the record to determine whether sufficient evidence supports an inference that such an agreement or understanding exists.

*Id.* (internal citations and quotation marks omitted); *see also Morales v. Freund,* 163 F.3d 763, 767 n. 5 (2d Cir.1999); *Wellman v. Dickinson,* 682 F.2d 355, 363 (2d Cir. 1982).

In support of its allegation that Defendants constituted a group, MVC relies on three general categories of circumstantial evidence. First, MVC points to sporadic email communications from March 2002 to January 2003, augmented by one phone call in October 2002, between Robert Knapp of the Millennium entities and Scott Nasca, a corporate vice president at Karpus. Second, MVC emphasizes Millenco's proxy materials, which included George Karpus himself as a directorial nominee on Millenco's slate, a so-called "Karpus Proposal" among Millenco's list of proposals, and certain other statements in the proxy materials which allegedly indicate that Millenco and Karpus agreed to vote their MVC shares in unison. Third, MVC cites

the allegedly coordinated or "tag team" trading by Millenco and Karpus between April 8, 2002 and July 22, 2002. Plaintiff appended to its Complaint a chart depicting this trading pattern. *See* Compl. Ex. B.

After fully considering all three categories of evidence, the Court is not persuaded that Defendants acted as a group. The record of communications between Karpus and Millenco is sporadic at best–approximately six messages prior to January 2003–and interrupted by large gaps of time between emails. Further, each communication followed a major public event that affected MVC shareholders. Moreover, the email messages themselves do not reveal any agreement to act together for the purpose of acquiring or voting MVC stock.[28]

The proxy materials do nothing to alter this conclusion. As Defendants point out, George Karpus was only added to the slate of Millenco nominees after the board was expanded–by MVC–from five to seven members. Similarly, the rhetoric contained within the proxy materials entirely fails to support an inference that Millenco and Karpus have agreed to vote their MVC shares together.

Finally, Plaintiff's allegation of coordinated trading is not substantiated by its supporting chart. Although Millenco and Karpus did tend to purchase MVC shares at separate times between April 13 and June 12, 2002, at various other periods they purchased shares at the same time. Indeed, Plaintiff's chart depicting Defendants' trading activity appears arbitrarily cropped, omitting at least 18 months of Karpus's trading in MVC stock. The chart also fails to reflect each Defendant's initial holdings, the volume of the trading

---

**28.** Most of the email exchanges were initiated by Nasca and consisted of general statements in support of Millenco's various efforts against MVC's board of directors and on behalf of MVC shareholders.

as a percentage of the market activity in MVC stock, and any stock sales by Defendants during the relevant period. In fact, the undisputed evidence showed that during April and May 2002 (the period in which the alleged staggering of purchases is most plausible) Karpus acquired a net of only 75 shares, or less than a fiftieth of a percent of its MVC holdings at the time. *See* Karpus Management, Inc. Schedule 13D, June 7, 2002, Deposition of Scott Nasca, Feb. 14, 2003, Ex. B. During the entire period in which the coordinated trading is alleged to have occurred, Karpus acquired a net total of 9609 shares, representing a mere 0.06% of MVC's outstanding stock.

Although the existence of an agreement is an issue of fact that depends on the circumstances of each case, Plaintiff fails to cite any cases finding the existence of a group on evidence as meager as that adduced here. In *Morales,* for example, the Second Circuit concluded that evidence of an explicit sales agreement with lock-up provisions between three shareholders of a closely held company (as well as the later depositing of their shares into identical trusts on the same day), supported a finding that the three shareholders constituted a group. *Morales,* 249 F.3d at 124–27. In the specific context of coordinated shareholder efforts to take control of a corporation, the Second Circuit has found group status satisfied on the basis of a presentation to potential buyers at which the defendants made their holdings available for sale as a block, supplemented by direct communications among the shareholders regarding the sale of the target corporation's securities. *Wellman,* 682 F.2d at 363–65. *See Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.,* 286 F.3d 613, 617–18 (2d Cir.2002) (finding that no group existed despite evidence of meetings and other communications between defendants, a "burst of purchases" by certain

defendants, and conversations recorded by a private investigator).

The Court is mindful that Plaintiff need not set forth direct evidence of an agreement between Millenco and Karpus with specified terms. *See Morales,* 249 F.3d at 122. At the same time, Plaintiff must set forth evidence that some agreement exists. Congress did not intend for § 13(d) to serve merely as an eleventh-hour bludgeon for management embroiled in proxy contests. *See Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58–59, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975); *see also Pantry Pride, Inc. v. Rooney,* 598 F.Supp. 891, 900 (S.D.N.Y.1984) ("Section 13(d) allows individuals broad freedom to discuss the possibilities of future agreements without filing under securities laws."). In this context the Court cannot find that Plaintiff has made a clear or substantial showing of likelihood of success on the merits of its § 13(d) claim.

### B. Section 16(b)

Plaintiff similarly alleges that Defendants acted as a group for the purposes of § 16(b) of the Exchange Act. 15 U.S.C. § 78p(b). Because § 16(b) and the rules promulgated thereunder incorporate the same "group" test as § 13(d), Plaintiff's failure successfully to press its § 13(d) claim spells defeat for its § 16(b) claim as well. *See* 17 C.F.R. § 240.16a–1 (providing that individual stockholders shall be considered a single owner of an issuer's stock if they would have been deemed a single owner under § 13(d) and the rules promulgated thereunder); *see also Feder v. Frost,* 220 F.3d 29, 33–34 (2d Cir.2000).

### C. Section 14(a) and Rule 14a–9

Finally, MVC alleges that Millenco violated § 14(a) of the Exchange Act and Rule 14a–9 promulgated thereunder by omitting material facts from, and including

material misstatements of fact in, its proxy materials. Section 14(a) subjects proxy solicitation materials to the rules prescribed by the SEC. 15 U.S.C. § 78n(a). Rule 14a–9(a), in turn, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement ... containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]

17 C.F.R. § 240.14a–9(a).

■ A fact is material for purposes of Rule 14a–9 "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.; see also Koppel v. 4987 Corp.*, 167 F.3d 125, 131 (2d Cir. 1999). "It is not sufficient to allege that the investor might have considered the misrepresentation or omission important. On the other hand, it is not necessary to assert that the investor would have acted differently if an accurate disclosure was made." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir.2000). Negligence can suffice to establish a violation of Rule 14a–9. *Wilson v. Great Am. Indus. Inc.*, 855 F.2d 987, 995 (2d Cir.1988).

MVC's § 14(a) claim focuses on three alleged omissions or misstatements: Defendants' failure to disclosure their overall plans for the fund should they prevail in the proxy fight (including their investment strategy, alleged intent to liquidate the fund, and the identity of the investment adviser they would choose); Defendants' failure to identify their status as a group under § 13(d); and Millenco's failure to disclose that its holdings of more than 3% of MVC's stock constituted a violation of § 12(d)(1)(A) of the ICA.[29]

As an initial matter, the Court's previous findings resolve in Defendants' favor most of the issues raised by the second and third alleged omissions. Rule 14a–9 does not impose a duty to disclose unsupported allegations of illegality. *See United States v. Matthews*, 787 F.2d 38, 45 (2d Cir.1986) ("Liability under Rule 14a–9 is predicated upon a showing that an allegedly omitted fact is true.") (internal quotation marks omitted); *Ciresi v. Citicorp*, 782 F.Supp. 819, 823 (S.D.N.Y.1991) ("The law does not impose a duty to disclose uncharged, unadjudicated wrongdoing."); *cf. Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1098 n. 7, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) ("Subjection to liability for misleading others does not raise a duty of self-accusation; [rather] it enforces a duty to refrain from misleading."). Disclosure of an untrue fact would be more misleading than its omission, thus defeating the purpose of the rule. *See Matthews*, 787 F.2d at 45. Rule 14a–9 therefore does not require the disclosure of a nonexistent agreement between Millenco and Karpus. Similarly, in light of the Court's disposition of the ICA claim, Millenco had no duty to disclose that its holding of MVC stock was unlawful. *See Lewis v. Potlatch Corp.*, 716 F.Supp. 807, 810 (S.D.N.Y.1989); *see also Hahn v. Breed*, 587 F.Supp. 1369 (S.D.N.Y.1984) (holding that the defendants were not required to

---

29. In the alternative, Plaintiff suggests that it was misleading for Millenco not to reveal that it did not in fact own all 6.7% of the MVC stock held by the stockholding Millennium entities.

disclose their alleged attempt to defraud shareholders where that underlying claim remained unsupported by plaintiffs).[30]

■ MVC's remaining § 14(a) claim is essentially a complaint that Defendants failed to reveal their "grand strategy" with regard to MVC should they win the proxy fight. Plaintiff has characterized statements in Defendants' proxy materials as vague or contradictory, and highlighted a veneer of certainty and unanimity surrounding Defendants' plans to increase shareholder value. MVC seeks a "clear explication from defendants, in one place, of their plans and strategy" and "a truthful and comprehensible explanation of [Defendants'] collective–or disparate–views." Pl. Trial Mem. at 34.

This grievance is not sufficient to establish liability under § 14(a). Provided that they have disclosed all material facts, Defendants are not required to disclose their motivations for waging the proxy contest or to recount the evolution of their strategy. *See Mendell v. Greenberg*, 927 F.2d 667, 674 (2d Cir.1990) ("A proxy statement need not disclose the underlying motivations of a director or major shareholder so long as all objective material facts relating to the transaction are disclosed."); *Rodman v. Grant Found.*, 608 F.2d 64, 71 (2d Cir.1979) (holding that directors need not disclose their "obvious interest" in corporate control); *Kaufman v. Cooper Cos.*, 719 F.Supp. 174, 183 (S.D.N.Y.1989) (refusing to require a "round by round synopsis" of negotiations among the proxy contestants when the proxy materials significantly disclosed the insurgents' goals and intentions). Plaintiff would apparently require Defendants to include a detailed plan outlining their vision for MVC's future; other than the identity of the potential investment adviser, however, MVC does not suggest any specific information or facts that were omitted from the proxy materials. *See Brayton v. Ostrau*, 561 F.Supp. 156, 164 (S.D.N.Y.1983) (dismissing a § 14(a) claim where "plaintiffs have alleged no other material facts that should have been disclosed and that would indicate that [defendant's] intentions were anything other than what they stated").

Indeed, an air of contradiction pervades Plaintiff's argument, which at some points decries the vagueness of Defendants' plans, and at other points criticizes them for appearing excessively certain. Pl. Trial Mem. at 40. Beyond mere speculation, however, MVC has yet to put forth evidence that Defendants' statements are not based on a good faith belief in a majority of the proposed directors' commitment to the course of action outlined in the proxy materials. *Cf. In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1245 (3d Cir. 1989) ("[A] statement of intent need only be true when made; a subsequent change of intention will not, by itself, give rise to a cause of action under Section 10(b) or Rule 10b–5.").

To the extent that Plaintiff argues that Defendants have already decided to liquidate MVC, certainly such information would be material. *Potomac Capital Mkts. Corp. v. Prudential–Bache Corp. Dividend Fund*, 726 F.Supp. 87, 91 (S.D.N.Y.1989) ("Liquidation is an event of magnitude for both the company and for the investors."). Again, however, MVC has not put forth sufficient evidence of any concealed decision to do so. *Id.* (holding that defendant-directors were not required to disclose that liquidation of an invest-

---

**30.** To the extent that Plaintiff locates the omission in Millenco's failure to reveal that the 6.7% of MVC stock over which it claimed "sole dispositive power" was actually dispersed among the four stockholding Millenni-

um entities, the Court finds that Millenco did in fact make such a revelation in its definitive proxy statement. *See* Millenco, L.P. Schedule 14A, Jan. 31, 2003, Knapp Ex. 9.

ment fund was merely a possibility); *see also Pantry Pride*, 598 F.Supp. at 901 ("[T]o require defendants to 'confirm' what are only speculative options would be as egregious as pretending that they do not exist.") (citing *Elec. Specialty Co. v. Int'l Controls Corp.*, 409 F.2d 937, 948 (2d Cir. 1969) (Friendly, J.)); *SEC v. May*, 134 F.Supp. 247, 257 (S.D.N.Y.1955) (concluding that the SEC had failed to show that defendants intended to liquidate the target fund).

Finally, although Millenco's selection of a specific investment adviser for MVC might also be a material fact,[31] Defendants emphatically denied that any agreement or memorandum of understanding had been reached with their first-choice to be the adviser, and the Court finds on the basis of the stipulated record that Plaintiff has not proven otherwise. *See* Knapp Dep. 63–67;

Tr. Oral Argument, Feb. 19, 2003, at 62–63.[32]

The Court therefore finds that Plaintiff has failed to carry its burden of showing the requisite likelihood of success on its § 14(a) claim as well.

## V. Conclusion

For the reasons stated above, the Court concludes that Plaintiff has failed to demonstrate a clear or substantial showing of likelihood of success on the merits of any of the claims it presses for injunctive relief. Because the Court has not found the requisite likelihood of success, it need not decide whether Plaintiff has established a presumption of irreparable injury. *Forest City Daly Housing*, 175 F.3d at 153.[33]

The application for a preliminary injunction is therefore denied.

SO ORDERED.

---

**31.** Of course, to the extent that any selection of an investment adviser would have to be approved by MVC's shareholders in the event of an insurgent victory, the materiality of such a selection is reduced. *See SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir.1968) (noting that the materiality of the nondisclosure of an anticipated event "will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity").

**32.** In the days following oral argument in this matter, Defendants did in fact sign, and dis-

close in its proxy materials, an agreement with a potential investment adviser.

**33.** As the Court mentioned in its Order of February 24, 2003, Defendants have strenuously argued that laches stands as a bar to Plaintiff's ICA claim. Because the Court has already rejected that claim on two independent grounds, including the merits, the Court does not address Defendants' laches argument.